295 So.2d 903 (1974)
Bernard A. FINKEL, Trustee, Plaintiff-Appellee,
v.
TEXAS-EDWARDS, INC., Defendant-Appellant.
No. 12309.
Court of Appeal of Louisiana, Second Circuit.
May 28, 1974.
Rehearing Denied July 1, 1974.
Writ Refused September 18, 1974.
*904 Lunn, Irion, Switzer, Johnson & Salley by Harry A. Johnson, Jr., Shreveport, for defendant-appellant.
Stagg, Cady & Beard by William M. Cady, III, Shreveport, for plaintiff-appellee.
Before AYRES, BOLIN and PRICE, JJ.
PRICE, Judge.
This is an action brought by the testamentary executor and trustee named in the will of Julia Levy, a New York domiciliary, seeking to recover damages under a contract of indemnity undertaken by defendant, Texas-Edwards, Inc., in favor of the decedent.
Defendant by exceptions of no right and cause of action contests the right or capacity of plaintiff to prosecute the action, and, in answer, denies an enforceable obligation has accrued under the contract.
The trial court sustained the exception of no cause or right of action and on appeal this court reversed the decision and remanded the cause for trial on the merits. See opinion reported at 267 So.2d 766 (La.App.2nd Cir. 1972).
After trial on the merits the district court rendered judgment for plaintiff in the sum of $204,142.60. Defendant perfected this devolutive appeal and plaintiff has answered the appeal, requesting an increase in the sum awarded as damages.
The sequence of events giving rise to this matter are substantially as follows:
On July 6, 1956, Julia Levy, the owner of a two-thirds undivided interest in the *905 fee title to property on the northeast corner of Texas and Edwards Streets in Shreveport, joined with the owners of the remaining one-third interest in a lease to Henry C. Beck Company for a term ending on September 1, 2021, for an annual rent of $30,000. This lease was assigned by Beck to 522 Market Street, Inc., whose corporate name was subsequently changed to Texas-Edwards, Inc. On May 2, 1957, an agreement was executed wherein Julia Levy agreed to join in a mortgage with the lessee, hypothecating her undivided fee interest in this property to enable the lessee to procure the necessary financing to construct a multi-story office building. This agreement was modified on June 19, 1957, to increase the sum of the proposed mortgage to Travelers Insurance Company to the sum of $2,300,000. In connection with this transaction an indemnity agreement was executed on August 25, 1959, wherein defendant, Texas-Edwards, Inc., agreed to perform all of the terms and conditions of the mortgage to Travelers and to indemnify and save Julia Levy harmless for all loss, cost, damage or expense incurred by her by reason of any default by defendant under the mortgage. The proposed mortgage was duly consummated with Travelers Insurance Company for the increased amount and the building was constructed as intended.
Julia Levy died on October 19, 1964, and her will was probated in the State of New York, the place of her domicile. Plaintiff, Bernard A. Finkel, was named in the testament as executor and was made trustee of two trusts which by the terms of decedent's will were the recipient of the residue of her estate after payment of several cash legacies. In an ancillary proceeding in the district court for Caddo Parish, Finkel's capacity as executor and trustee under the New York proceeding was recognized and he was sent into possession as trustee of all of the decedent's property in this State after payment of appropriate inheritance taxes owed the State of Louisiana.
The rental payments under the lease with Texas-Edwards, Inc. falling due on August 1st of each year were duly paid unto plaintiff until 1970, at which time the lessee defaulted on his lease payments and also defaulted on the mortgage to Travelers. The property subject to the mortgage, including decedent's two-thirds fee interest and rights to lease rentals, was seized by the Sheriff of Caddo Parish under foreclosure proceedings instituted by the mortgagee on or about September 25, 1970, and subsequently sold at public sale.
Plaintiff seeks damages under the indemnification agreement from defendant for loss of the value of ownership rights in the property of $210,000, loss of past due rentals, $46,666.64, and attorney's fees and incidental expenses of $4,500.
The trial court found plaintiff entitled to the sum of $200,000 for general damages (value of loss of property right); and $4,142.60 for special damages, including attorney's fees.
The two issues presented for resolution on this appeal are the capacity or right of plaintiff to bring the action, and the correctness of the amount awarded as damages for breach of the indemnity agreement.

EXCEPTION OF NO RIGHT OF ACTION
Defendant's position that plaintiff has a lack of procedural capacity to maintain this action stems from the language of the August 25, 1959, indemnity agreement, which states in part:
"In consideration of the execution and delivery of Levy of a certain mortgage to The Travelers Insurance Company.... and in pursuance of the provisions of that certain agreement dated May 2, 1957, as amended by amendment dated June 19, 1959 .... Texas covenants and agrees, for the benefit of Levy, her heirs, executors, administrators, and assigns, as follows...." (Emphasis ours)
*906 Defendant contends the agreement does not specifically include a trustee as a beneficiary of the covenants imposed on it by the agreement and that plaintiff's power and authority as an executor terminated upon his being recognized and sent into whatever property decedent owned in this State by the judgment of possession rendered in the ancillary probate proceeding. Thus, under these circumstances, defendant contends plaintiff has no capacity to sue.
Defendant further contends should it be determined plaintiff continues to have authority to proceed as an executor, then in that event he should not be allowed to recover as no actual loss has been shown to have accrued to him in this capacity which is a condition precedent in an action under a contract of indemnity obligating the indemnitor to hold the indemnitee harmless from an actual loss as opposed to an agreement merely indemnifying against liability.
Further discussion of this argument of defendant is unnecessary because of our conclusion plaintiff has the capacity to proceed as trustee.
Defendant's opposition to plaintiff's capacity or authority to sue to enforce this contractual obligation hinges on the technical contention that the failure of the August 25, 1959 written contract to specifically enumerate a "trustee" as one of the contingent beneficiaries of the contract in the absence of the indemnitee, Levy, precludes an intention that the benefits of the contract inure to such a status.
We do not find the parties intended any such limitation when the August 25, 1959 instrument is construed together with the May 2, 1957 agreement from which it emanates. The former contract in which defendant obligated itself to execute a contract of indemnity to protect Levy provided she fulfilled her agreement to execute the proposed mortgage on her fee interest, contained the following provision:
"6. This agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective heirs, administrators, executors, successors and assigns." (emphasis supplied)
Bouvier's Law Dictionary defines successor as "one who follows or comes into the place of another." The term "successor" is generally understood to encompass one who takes the place of another by operation of law, and including laws of descent and distribution. See definitions contained in Words and Phrases, Vol. 40A, page 21. Also the Succession of Marlin, 240 So.2d 387 (La.App.2nd Cir. 1970). Without doubt, a trustee falls within the meaning of a successor.
We further find it appropriate to consider all of the contracts executed between decedent and defendant or its predecessors relating to this same subject matter in construing the limitations on or extensions of the habendum clause herein involved.
Under the rules for interpretation of agreements the Louisiana Civil Code provides as follows:
"Art. 1949. When there is anything doubtful in one contract, it may be explained by referring to other contracts or agreements made on the same subject between the same parties, before or after the agreement in question."
"Art. 1950. When there is anything doubtful in agreements, we must endeavor to ascertain what was the common intention of the parties, rather than to adhere to the literal sense of the terms."
"Art. 1957. In a doubtful case the agreement is interpreted against him who has contracted the obligation."
"Where several instruments are made as part of one transaction and relate to the same subject matter, so that they may be read as one instrument, recitals in one may be explained, amplified, or *907 limited by reference to the other." 17A C.J.S. Contracts § 298, page 135.
Reviewing these contracts together we have no difficulty in concluding the parties intended for the benefits of the agreement to flow to Levy's successors, whether heir or testamentary trustee.
Although no specific assignment of error is made in this regard, there is an inference in defendant's brief to this court that cash payments made to Julia Levy in connection with the agreement executed May 2, 1957, and amending agreement of June 19, 1959, were the moving consideration for her agreement to hypothecate her fee interest in the property to allow defendant to procure financing for the building and she was willing to assume the risk involved to obtain this payment totaling some $30,000. Therefore, it is contended her representative has no right to demand indemnification from defendant for the loss of decedent's property by foreclosure. This argument is in direct contradiction of the express terms and stated purposes of the contracts involved and has no merit. The cash payment as we interpret the agreement was only a part of the inducement to decedent to join in the mortgage. The indemnity agreement was of equal importance, considering the value of the property belonging to decedent and the risk undertaken by her in subjecting her property to the mortgage and subordinating her lessor's privileges to it.

AWARD OF DAMAGES
J. Pollard Sealy, Jr., a real estate appraiser of Shreveport, testified on behalf of plaintiff as to the market value of the two-thirds undivided fee interest in subject property at the time of its loss by foreclosure. Mr. Sealy had previously appraised this same interest on February 4, 1965, in connection with the determination of estate and inheritance taxes owing by Julia Levy's succession. His prior appraisal was relied on in giving testimony in this cause and the method of appraisal as reflected by his written report of February 4, 1965, is as stated therein:
"The purchaser of the property subject to this appraisal would receive a net income for the period of the lease and at the end of this time would receive the reversion of the land and building. Because of the length of the lease, I do not feel that a typical purchaser would get any value to the reversion. The value of a $1 receivable 57 years hence discounted at 8% annually is 1.2¢. Because of this and the possibility that a 60 year old building might cost more to tear down than the land would be worth, I do not feel that an investor would give any value to this reversion.
"The valuation would be dependent upon a capitalization of the net income over the period of the lease. At the rate of return which a typical investor would require taking into consideration the risks involved in the investment.
"The mortgage interest rate on a 70% first mortgage would be 6%. The rate of return which would be required to sell the Lessee's equity would be 10-12%. Since the relative risk of the Lessor's position lies between the risks of the mortgages and the equity owner, it is reasonable to assume that the proper capitalization rate would be somewhere between 6% and 12%.
"I have been unable to find any sales of leased fees in Shreveport, New Orleans, Dallas or Atlanta which have enough comparability with subject property to make a valid comparison.
"Investors, in Shreveport, and most other cities in the South and Southwest, on new buildings, for National or strong regional tenants with a 15 year lease term demand a return of 8% net before depreciation. While there is no subordination involved, the shortness of the lease when compared with subject and the certainty of some depreciation in the improvements, in my opinion, make them comparable investments.

*908 "An 8% return would represent a 1/3 increase in rate about the mortgage rate of 6%. In my opinion, this would be reasonable in view of the risks involved.
"Leases are currently being made in the South and Southwest by Lessee's desiring subordination by the landowner at 8% of current value. This would indicate that the owners think this is a proper rate.
"In view of the above, it is my opinion that the property capitalization rate for subject property is 8% and value would be as follows:

Net Rental for Entire Leased Fee $ 30,000
Value of Entire Leased Fee $30,000 = $375,000
 _______
 .08

"Partial interests are generally not worth the proportionate part of the whole. Because of the long lease, the net rental and the freedom from management burden, I feel the subject property would sell for its proportionate part of the value of the entire leased fee. Value of subject is as follows:
2/3 × $375,000 = $250,000"
This estimate was brought up to date by Mr. Sealy and revised to the sum of $200,000 because of the changes in interest rates accruing between 1964 and the time of foreclosure which caused a decline in value of subject property of $50,000.
No evidence was presented by defendant to refute Mr. Sealy's testimony. On the basis of this evidence the trial court awarded plaintiff the sum of $200,000 as general damages sustained as a result of defendant's default on the mortgage causing the loss of plaintiff's property.
The sole complaint by defendant on this appeal relating to the award for damages is in regard to the competency of plaintiff's expert appraiser, Mr. Sealy, to testify in this cause. Defendant contends Mr. Sealy was not actively engaged in the real estate appraisal field at the time of trial and was thus not competent to give an opinion on market value.
The record reflects Mr. Sealy has actively engaged in the real estate brokerage field since 1946 and has had extensive experience in the sale, development and appraisal of residential, commercial and industrial properties in Shreveport. He is president of Sealy Realty Company, and several corporations owning multi-story buildings in Shreveport. Although it is true Mr. Sealy testified he had limited his personal activities in appraisal work in recent years because of lack of time, he continues to engage in this work for some of his former clients who request his services. Because of his extensive past experience in this field, we have no hesitancy in accepting Mr. Sealy's qualifications as an expert real estate appraiser.
Defendant also contends we should consider Mr. Sealy an interested party as he was one of the purchasers of this property at the foreclosure sale and owns a five percent interest in the property.
We fail to see that this factor would influence Mr. Sealy's testimony as the amount of recovery of damages by plaintiff has no relationship or connection with the present ownership of this property.
In answer to this appeal, plaintiff requests an increase in the award to include the amount of loss of rental to the trusts under the lease occurring since the last payment made on October 1, 1970, until the time of trial in February, 1973.
We do not find plaintiff is entitled to claim this as an item of separate damages as the appraisal of Mr. Sealy was made as of the date of seizure under foreclosure proceedings in September, 1970. This loss of rental was therefore included in his method of appraisal utilized in arriving at the market valuethe capitalization of rental income anticipated under the lease.
For the foregoing reasons the judgment appealed from is affirmed at appellant's cost.