### INTERCONTINENTAL ENGINEERING–MANUFACTURING CORPORATION, Plaintiff-Appellee,

v.

### C. F. BEAN CORPORATION, Defendant-Appellant.

No. 80–3768
Summary Calendar.

United States Court of Appeals,
Fifth Circuit.
Unit A

June 12, 1981.

Rehearing Denied July 30, 1981.

John A. Hollister and H. Sloan McCloskey, New Orleans, La., for defendant-appellant.

Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Robert B. Bieck, Jr., New Orleans, La., for plaintiff-appellee.

Before BROWN, POLITZ and TATE, Circuit Judges.

TATE, Circuit Judge:

The C.F. Bean Corporation (Bean) challenges a judgment of the district court holding Bean liable *in solido* with the John Robinson Company (Robinson) for Robinson's breach of a sales contract. That judgment was predicated on the district court's determination that an escrow agreement embodying a conditional sales contract between Bean and Robinson expressly authorized and required Robinson to sell certain equipment belonging to Bean, that Robinson was therefore acting as Bean's agent in the subsequent sale, and that Bean and Robinson were therefore liable *in solido* as principal and agent for Robinson's breach of the subsequent sales contract.

For the reasons delineated below, we agree with the district court's interpretation of the Bean-Robinson relationship. Accordingly, the judgment below is affirmed.

### Facts

The plaintiff-appellee in this Louisiana diversity action, Intercontinental Engineering-Manufacturing Corp. (Intercon), is a Delaware corporation with its principal place of business in the state of Missouri. Bean, the defendant-appellant, is a New York corporation with its principal place of business in the Eastern District of Louisiana. The defendant Robinson, which is not a party to this appeal, is a Texas corporation with its principal place of business in that state.

The ultimate issue is whether Bean is liable to Intercon for failure to deliver two Frame 5 gas turbines. The issue arises in a relatively complicated factual context surrounding the relationship of the three above-named corporations that warrants a fairly detailed exposition.

In 1977, Robinson acquired a lease to certain property fronting on the Industrial Canal in New Orleans, Louisiana. In the summer of that year, Bean entered into negotiations with Robinson for the purchase or assumption of that lease.

At the time of these negotiations, Robinson's representative, Glenn T. Cummings, believed from past transactions in which he had participated that Bean had three Frame 5 General Electric gas turbines on hand at its Salt Lake City, Utah, premises.[1] Bean, however, informed Cummings that it did not know how many Frame 5 turbines it had on hand. Neither party ever inspected Bean's Salt Lake City premises to determine how many turbines were in fact located there.

As the negotiations between Bean and Robinson progressed, it became evident that Bean was reluctant to put up the amount of cash sought by Robinson. It was therefore agreed that Bean could put up a lesser amount of cash and tie in certain equipment (which Cummings believed included three Frame 5 turbines) to the deal.

---

1. In the early 1970's, Cummings (acting as an employee of Robinson) had purchased four Frame 5 turbines from General Electric and had resold those turbines to Bauer Dredging. He had thereafter arranged for the rebuilding of two of those turbines at the General Electric shop in Salt Lake City.

Sometime thereafter, Bauer Dredging became an entity known as B–R Dredging Company, which was subsequently purchased, along with all its assets (including the four turbines), by Bean. In 1975, Cummings (acting in his own behalf and not as an employee of Robinson) purchased from Bean one of the two subsequently rebuilt turbines he had earlier sold to Bauer Dredging. An associate of Cummings, one Hickum, had inspected Bean's Salt Lake City premises pursuant to that purchase and had reported the presence of the four Frame 5 turbines.

Thus, Cummings believed that Bean retained three Frame 5 turbines—one rebuilt and two that had been cannibalized for parts.

An agreement was reached in early August of 1977. On August 5, Bean and Robinson executed an Escrow Agreement (Exhibit No. 2) which spelled out the terms of their transaction. Bean agreed to purchase or assume, and Robinson agreed to sell or assign, the lease on the Industrial Canal property for a total payment of $270,000. This sale, however, was conditioned upon the approval of Bean as the new lessee by the Board of Commissioners of the Port of New Orleans (Dock Board).

In pertinent part, the Escrow Agreement provided that Bean (purchaser) would deposit with the escrow agent $150,000 in cash as well as separate bills of sale to Robinson for the equipment located in Salt Lake City —namely, "One (1) or more" Frame 5 gas turbines and two locomotive "A" cab units with the traction motors removed.[2] Robinson (vendor) would deposit, in addition to the documents necessary to transfer its rights in the leased property to Bean, an agreement that it would use its best efforts to sell the Bean equipment as soon as possible, would apply the first $120,000 realized from that sale to the purchase price of the leasehold, and would evenly divide the remainder of the proceeds with Bean.

The Escrow Agreement also provided that in the event the Dock Board approved Bean as the new lessee of the Industrial Canal property, an agreement to purchase the lease would be executed by the parties within seven days and the escrow agent would release the escrowed items to the appropriate parties. In the event the Dock Board did not approve Bean as the new lessee by August 15, 1977, the Agreement provided for cancellation at the option of either party. In any event, the Escrow Agreement was to terminate on September 15, 1978, unless a written extension was entered into by both parties.

Meanwhile, independently of the Bean-Robinson negotiations, but with knowledge of them, Robinson's president, Paul McDaniel, was discussing the sale of Frame 5 turbines with Intercon. Intercon had developed a pressing need for a rebuilt Frame 5 turbine in approximately July of 1977.[3] Having once before discussed with Robinson the possibility of purchasing such a turbine,[4] Intercon's president, William Sales, contacted McDaniel to inquire whether a Frame 5 turbine was still available. Sales was informed by McDaniel that the turbine was still on the market and Sales restated his offer to purchase it for $65,000. McDaniel informed him that the offer was too low. Sales then offered $100,000, to which McDaniel replied that he would ascertain the reaction to that offer.

Sometime thereafter, McDaniel informed Sales that the asking price for the rebuilt turbine was $150,000, but that he would "sweeten" the deal by adding two locomotive "A" cab units and two cannibalized Frame 5 turbines, "as is," for the same price.

On August 5, 1977, McDaniel telexed Sales and offered to sell the package of

2. Prior to the 1970's, General Electric manufactured some 30 gas turbine engines of the type known as "Frame 5." These turbines were built for the Union Pacific Railroad for use in railroad locomotives. These locomotives consisted of two units—a front unit designated the "A" cab, which contained the electric controls and traction motors, and a rear unit designated the "B" cab, which contained the gas turbine.

3. Union Pacific (see note 2 supra) eventually discontinued the use of gas turbines, and the turbines and locomotive assemblies were returned to General Electric for resale. Intercon, which used the gas turbines and the electrical equipment from the locomotive assemblies to power a large hydraulic cutter head dredge, became the largest single customer for this surplus equipment. Intercon now owns twenty-two—and at one point owned as many as twenty-four—of the 30 Frame 5 turbines ever manufactured by General Electric. The majority of those turbines were purchased by Intercon from General Electric through Robinson as intermediary.

4. In 1975, McDaniel contacted Intercon President William Sales to inform him that a rebuilt Frame 5 turbine might be available for purchase. Sales told McDaniel he would be willing to purchase it for $65,000. McDaniel responded that Sales's offer would not "thrill" anyone, but that he would transmit the offer.

The discussion ended there. Sales heard nothing further from McDaniel concerning the purchase of that rebuilt turbine.

three Frame 5 turbines (one rebuilt and two "as is") and two "A" cabs for $150,000, subject to the Dock Board's approval of the C.F. Bean Corporation as the new lessee of certain property fronting on the Industrial Canal in New Orleans (Exhibit No. 5). Sales accepted this offer via telex on August 12, 1977 (Exhibit No. 6).

On August 12, 1977, Robinson and Bean executed a document entitled "Amendment to Escrow Agreement and Instructions to Escrow Agent" (Exhibit No. 3). That document recited that the parties had located a purchaser for the Bean equipment described in the original Escrow Agreement—specifically, that Intercon had agreed to purchase the equipment for $150,000—and instructed the escrow agent to return the separate bills of sale covering the equipment to Bean so that Bean could execute a new bill of sale for the equipment to Intercon. The Amendment further instructed the escrow agent, upon receiving the $150,000 payment from Intercon, to disburse $15,000 each to Bean and Robinson and to hold the remaining $120,000 in lieu of the Bean equipment pending Dock Board approval of Bean as the new lessee of the Industrial Canal property. In the event that Dock Board approval was secured, the escrow agent was instructed to release to Robinson both the $150,000 deposited by Bean and the $120,000 received from Intercon. In the event that Dock Board approval was not secured (the August 15, 1977, deadline being extended by one month), the escrow agent was to release the entire $270,000, with all interest earned, to Bean. The agent was further instructed to purchase United States treasury bills with the escrowed funds, with the interest thereon to be credited to Bean.

Subsequently, Intercon paid $150,000 to the Bean-Robinson escrow account. The escrow agent disbursed $135,000 to Robinson and $15,000 to Bean, as per the amended Escrow Agreement. Intercon received one rebuilt Frame 5 turbine and two "A" cabs, but did not receive the two "as is" turbines promised by Robinson. Although it is clear that the undelivered turbines did exist, they have never been located.

On May 30, 1979, Intercon instituted this diversity action against Robinson and Bean in the United States District Court for the Eastern District of Louisiana, seeking $150,000 in damages for Robinson's failure to deliver the two "as is" turbines as promised. Intercon's complaint alleged, in the alternative, either that Bean or Robinson were joint owners of the subject matter of the contract, or that Robinson had acted as Bean's agent in the sale.

Robinson failed to answer the complaint, and on July 30, 1979, Intercon took a default judgment against Robinson for the full amount of the damages sought. Bean did answer the complaint and on November 14, 1979, cross-claimed against Robinson seeking to be indemnified for the amount of any judgment assessed against it in favor of Intercon. Robinson likewise failed to answer the cross-claim, and a default judgment was entered in favor of Bean on April 8, 1980.

The issue of Bean's liability to Intercon was tried to the court without a jury. The trial court concluded that Bean was the owner of the equipment at the time of the Intercon sale, that Robinson was expressly authorized to use its best efforts to find a purchaser for that equipment, and that Robinson was therefore acting as Bean's agent in contracting with Intercon. Accordingly, the court held Bean, as Robinson's principal, solidarily liable with Robinson for the breach of the Intercon sale.

There is no question on this appeal that Robinson breached its sales contract with Intercon by failing to deliver the two Frame 5 turbines in "as is" condition, as per the terms of that agreement. The sole question brought before this court is the extent to which Bean is answerable for Robinson's breach. Bean's position is that the trial court erred in concluding that the Escrow Agreement created a principal-agent relationship between Bean and Robinson, and that even if Robinson did act as Bean's agent, Intercon is barred by the election of remedies doctrine from pursuing this claim against Bean.

We find no merit in Bean's position.

*The Agency Issue*

Bean first contends that Robinson had purchased the equipment from it by virtue of the escrow agreement providing that Bean deposit bills of sale of the equipment to Robinson.

Under the law of Louisiana,[5] a sale made with a suspensive condition does not transfer title in the object sold until the condition is fulfilled. La.Civ.C. art. 2471. The suspensive condition—which is the civil law analogue of the common law condition precedent, *see Hardin v. Mutual Life Ins. Co. of New York*, 12 So.2d 488, 490 (La.App. 2d Cir. 1943)—is defined in article 2043 of the Louisiana Civil Code as follows:

> The obligation contracted on a suspensive condition, is that which depends, either on a future and uncertain event, or on an event which has actually taken place, without its yet being known to the parties.
>
> In the former case, the obligation cannot be executed until after the event; in the latter, the obligation has its effect from the day on which it was contracted, but it cannot be enforced until the event be known.

Paragraph (3) of the Escrow Agreement executed on August 5, 1977, clearly conditions the binding effect of the Bean-Robinson transaction upon the future uncertain event of the Dock Board's approving Bean as the new lessee of the Industrial Canal property.[6] *See Wampler v. Wampler*, 239 La. 315, 118 So.2d 423, 425–26 (1960). Only in the event of such approval would Bean receive the documents necessary to transfer Robinson's leasehold interest. Only in the event of such approval would Robinson receive the consideration due therefor. That was the sole purpose of the Escrow Agreement. *Wampler v. Wampler, supra.*

■ We therefore conclude that the Escrow Agreement embodied a sale under a suspensive condition and did not purport to transfer ownership of the equipment in question to Robinson until such time as the underlying condition was fulfilled. La. Civ.C. art. 2471; *Wampler v. Wampler, supra.*

As noted by the district court, this conclusion is strongly supported by the provisions of the amended Escrow Agreement executed on August 12, 1977:

> That agreement provided that Bean, not Robinson, would execute the bills of sale to Intercon. The portion of the purchase price ($120,000) which was to be deposited with the escrow agent, along with the $150,000 previously deposited by Bean was to be invested for the benefit of Bean pending the finalization of the sale of the leasehold. The document further recognized that in the event that the lease transaction was not consummated, the escrowed funds—including the $120,-000 referable to the sale of the Salt Lake City equipment—would be returned to Bean.
>
> It is clear that Robinson was confined to act in conformity with the escrow agreement. Robinson was authorized to sell, but was not free to dispose of the proceeds of such sale except in conformity with the terms of the escrow agreement.

District Court Opinion, at pp. 6–7.

Bean's assertions to the contrary are without merit.

---

**5.** The Bean-Robinson relationship arises out of a contract executed in Louisiana and purporting to transfer a leasehold interest in immovable property located in that state. Thus, in this diversity action, the law of Louisiana is to be applied. *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *Erie R. R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); La.Civ.C. art. 10.

**6.** Paragraph (3) of the Escrow Agreement reads, in pertinent part:

> (3) In the event that the [Dock Board] approves Purchaser [Bean] as the new lessee of the aforementioned property ... and upon the execution of an agreement to purchase between Purchaser [Bean], Vendor [Robinson] and Standard Dredging [the current primary lessee] within seven days of said approval, then Escrow Agent will release immediately to Vendor [Robinson] the money escrowed by Purchaser [Bean] less deductions authorized by Paragraph 8. At the same time Escrow Agent shall release to Purchaser [Bean] those titles, releases, or bills of sale as set forth in Paragraph 2.

Relying on article 2456 of the Louisiana Civil Code, Bean contends that the sale was perfected, and title was transferred, "as soon as there exist[ed] an agreement for the object and for the price thereof, although the object [had] not yet been delivered, nor the price paid." La.Civ.C. art. 2456. Bean's reliance is misplaced. That article, which states the general rule governing sales, *does not apply in the present case.* The effect of a sale made under a suspensive condition is governed by the particular rule set out in article 2471: "A sale, made with a suspensive condition, does not transfer the property to the buyer, until the fulfillment of the condition." La.Civ.C. art. 2471.

Bean attempts to characterize the transaction as a sale under a *resolutory* condition [7] that would allow the parties to withdraw from the perfected sale in the event that the Dock Board did not approve the lease. The original Escrow Agreement does contain a provision allowing either party to withdraw in the event that Dock Board approval was not forthcoming by August 15, 1977.[8] This limited provision does not, however, embody the condition to which the transaction as a whole was subject. Its sole purpose was to allow the parties the option to withdraw in the event that the underlying suspensive condition—Dock Board approval—remained unfulfilled for more than ten days following the execution of the agreement. That provision in no way altered the fact that the obligations of the parties with regard to the transfer of the leasehold interest and the consideration due therefor remained in suspension until such time as Dock Board approval was granted.

■ The amended escrow agreement clearly provides that Bean was to receive the escrowed sales price paid by Intercon, if the Dock Board did not approve the transfer of the lease to Bean. The amendment thus corroborates that no completed sale of the equipment from Bean to Robinson had occurred. Bean, however, contends that the trial court was barred from looking to the terms of the amended Escrow Agreement— which Bean characterizes as a novation of the original agreement—by article 2276 of the Louisiana Civil Code,[9] which bars admission of parol evidence "against or beyond" what is contained in the writing before the court. The amended Escrow Agreement is no novation—it contains no stipulation extinguishing the preexisting obligations created by the original Escrow Agreement. La.Civ.C. arts. 2185, 2187.[10] To the contrary, it expressly incorporates all provisions of the prior agreement, except to the extent that modifications were necessitated by the fact that a purchaser had been found for the Bean equipment. Thus, the amended Escrow Agreement is precisely what it facially purports to be: an interrelated administrative amendment of

7. The resolutory condition is an analogue to the common law condition subsequent. La.Civ.C. art. 2045 defines the resolutory condition as follows:

> The dissolving [resolutory] condition is that which, when accomplished, operates the revocation of the obligation, placing matters in the same state as though the obligation had not existed.

> It does not suspend the execution of the obligation; it only obliges the creditor to restore what he has received, in case the event provided for in the condition takes place.

8. Paragraph (4) of the Escrow Agreement reads:

> (4) In the event that the [Dock Board] does not approve Purchaser [Bean] as the new Lessee by August 15, 1977, then, at the option of either Purchaser [Bean] or Vendor [Robinson] the agreement to purchase shall be cancelled and the escrowed items shall be returned by the Escrow Agent to the respective parties promptly.

9. La.Civ.C. art. 2276 provides:

> Neither shall parol evidence be admitted against or beyond what is contained in the acts, nor on what may have been said before, or at the time of making them, or since.

10. Novation is a contract, consisting of two stipulations; one to extinguish an existing obligation, the other to substitute a new one in its place.
La.Civ.C. art. 2185.

> The preexistent obligation must be extinguished, otherwise there is no novation; if it be only modified in some parts and any stipulation of the original obligation be suffered to remain, it is no novation.
*Id.* art. 2187.

the original Escrow Agreement rather than a substituted new agreement. As such, the court below was free to refer to its terms in order to determine the effect of the parties' transaction. La.Civ.C. arts. 1949, 1955;[11] *Finkel v. Texas-Edwards, Inc.*, 295 So.2d 903, 906 (La.App. 2d Cir.), *writ ref'd*, 299 So.2d 798 (La.1974) (no error); *Makofsky v. Cunningham*, 576 F.2d 1223, 1230 & n.10 (5th Cir. 1978).

█ Finally, Bean contends that the record does not show that the suspensive condition underlying the Bean-Robinson transaction remained unfulfilled on August 12, 1977—the date of the Intercon sale. The district court found otherwise:

> The escrow agreement did not constitute a sale by Bean to Robinson with respect to the equipment. Had the Dock Board ratified the lease prior to the sale to Intercon the equipment, along with the escrowed funds, would have passed to Robinson. However, at the time of the sale, the condition upon which the property would have been transferred to Robinson, had not yet occurred.

District Court Opinion, at p. 6. The finding—that the suspensive condition remained unfulfilled—is not clearly erroneous. The fact that Dock Board approval was inserted as a suspensive condition to the Intercon sale, and that the amended Escrow Agreement expressly extended the deadline for such approval because the Dock Board had "encountered delays in considering the application by Bean as the new lessee of the property owned by the Board" provides ample support for the district court's finding.

For these reasons, we conclude that the trial court did not err in concluding that Bean, and not Robinson, was the owner of the equipment in question at the time of the Intercon sale.

As its last stand, Bean contends that Robinson did no more than sell to Intercon equipment that Robinson had purchased under an as-yet-unfulfilled suspensive condition. Bean argues that while such a sale might well place Robinson in the unsavory position of selling equipment it did not itself own, it does not constitute Robinson the agent of the rightful owner, Bean. This argument is unpersuasive.

The courts of Louisiana have defined an agent as one who acts for or in the place of another by virtue of authority from the latter. *E. g., Craft v. Trahan*, 351 So.2d 277, 281 (La.App. 3d Cir. 1977). *See* La. Civ.C. art. 2985.[12] By the express provisions of the original Escrow Agreement, Bean authorized Robinson to use its best efforts to find a purchaser for the equipment belonging to Bean.[13] Although the district court recognized that the effect of the Escrow Agreement would be to transfer title in the equipment to Robinson in the event that the suspensive condition was fulfilled prior to the sale of the equipment to a third party, it is nevertheless clear that that was not the result the parties sought to achieve. The Escrow Agreement clearly contemplated the sale to a third party of property belonging to Bean, the payment of the purchase price by the third party pur-

---

11. When there is anything doubtful in one contract, it may be explained by referring to other contracts or agreements made on the same subject by the same parties before or after the agreement in question.
La.Civ.C. art. 1949.
> All clauses of agreements are interpreted the one by the other, giving to each the sense that results from the entire act.
*Id.* art. 1955.

12. A *mandate, procuration* or *letter of attorney* is an act by which one person gives power to another to transact for him and in his name, one or several affairs.
La.Civ.C. art. 2985.

13. Paragraph (2)(c) of the original Escrow Agreement provides:
> (2) Vendor [Robinson] hereby agrees to deposit with the Escrow Agent:
> . . . .
> (c) An agreement that Vendor [Robinson] shall use his best efforts to sell the turbine and "A" cabs as soon as possible and that the Vendor [Robinson] shall retain the first $120,000 realized from said sale, and that all monies received in excess of $120,000 on the sale by the Vendor [Robinson] of the turbine and "A" cabs shall be split equally between the Vendor [Robinson] and the Purchaser [Bean].

chaser into the Bean-Robinson escrow account, and the subsequent release of the proceeds to the appropriate party depending upon the fulfillment or not of the underlying suspensive condition. To effectuate that purpose, the Escrow Agreement expressly authorized Robinson to act for Bean in contracting the sale. That is precisely what Robinson did.

We conclude, therefore, that Robinson acted as Bean's expressly authorized agent in contracting with Intercon for the sale of the equipment in question. Bean's authorization covered the sale of "one or more" Frame 5 gas turbines. Despite knowledge that Robinson believed the "one or more" turbines to include three turbines, Bean made no attempt to determine how many turbines it in fact had or to prevent Robinson from contracting (as it subsequently did) for the sale of more than one. Instead, Bean allowed Robinson to proceed with the Intercon sale and accepted the benefits accruing from the resulting contract. Thus, to whatever extent Robinson might be said to have exceeded its authority in contracting for the sale of three turbines, its actions were ratified by Bean. *See* La.Civ.C. arts. 438, 439, 1840, 3000, 3010;[14] *Dunham-Pugh Co. v. Stephens*, 234 La. 218, 99 So.2d 88, 93–95 (1958); *Russ v. United Farm Equipment Co.*, 230 La. 889, 89 So.2d 380, 382 (1956); *Acadian Production Corp. v. Savannah Corp.*, 222 La. 617, 63 So.2d 141, 143–44 (1953).

### The Election of Remedies

Finally, Bean contends that even if Robinson did act as its agent in the Intercon sale, Intercon—by proceeding to judgment against Robinson, the agent of an undisclosed principal (Bean)—has waived any further claims against Bean under Louisiana's election of remedies doctrine.

Under Louisiana law, a principal is bound by the authorized or ratified acts of his agent. La.Civ.C. art. 3021. The agent, however, is liable to those with whom he

contracts on behalf of his principal only when he has bound himself personally or has exceeded his authority without informing his cocontractant of the extent of his powers. La.Civ.C. art. 3013. Generally, an agent is held to have bound himself personally when he enters into an agreement without disclosing the identity of his principal. *E. g., Chappuis & Chappuis v. Kaplan*, 170 La. 763, 129 So. 156 (1930); *Williams v. O'Bryan*, 257 So.2d 174, 175–76 (La.App. 3d Cir. 1972); *Foshee v. Hand-Enis Realty Co.*, 237 So.2d 437, 440 (La.App. 3d Cir. 1970); *Bush v. Saucier*, 197 So.2d 907, 908 (La.App. 1st Cir. 1967); *Three Rivers Hardwood Lumber Co. v. Gibson*, 181 So. 607, 609 (La.App. 2d Cir. 1938). In such situations, it has been held that either the principal or the agent may be held liable. *E. g., Darr v. Kinchen*, 176 So.2d 638, 640 (La.App. 1st Cir.), *writ ref'd*, 248 La. 386, 178 So.2d 664 (1965).

Bean's position on this appeal is that the remedy in such situations is exclusively alternative—*i. e.*, that a plaintiff may recover against one or the other, but not both. In so arguing, Bean relies heavily upon the following language in *LaBella Insulation, Inc. v. Connolly*, 182 So.2d 117, 119 (La.App. 4th Cir. 1966):

> In an action ex contractu, one who acts for an undisclosed principal may be sued in the alternative with the alleged principal. However, the plaintiff may recover from one only, and not from both . . . .

A closer reading of *LaBella* discloses that the quoted language somewhat overstates the Louisiana rule. The plaintiff in *LaBella* sued the agent, Connolly, and his undisclosed principal *in the alternative* on a contract apparently executed by Connolly. The trial court entered separate judgments, each for the full amount, against both Connolly and his principal. In reversing the judgment against Connolly, the Louisiana appellate court stated:

14. The Code articles cited are those identified by the Supreme Court of Louisiana in *Acadian Production Corp. v. Savannah Corp.*, 222 La. 617, 63 So.2d 141, 144 (1953) as embodying the ratification doctrine in Louisiana.

Since *Plaintiff asked judgment only in the alternative* against one or the other of Defendants and, as of now, has final judgment against Defendant corporation, we cannot see how, under the evidence adduced, that it can now obtain the *same* judgment against Connolly.

*LaBella Insulation, Inc. v. Connolly*, 182 So.2d at 118 (emphasis added).

As we read *LaBella*, it stands only for the proposition that where a plaintiff seeks to recover *in the alternative* from either an agent or his undisclosed principal, he cannot obtain the *same* judgment against both. At most, *LaBella* stands in accord with those Louisiana cases, such as *Dumaine & Co. v. Gay, Sullivan & Co.*, 192 So. 117, 119–20 (Orl.App.1939), holding that a party may lose his right to sue the agent by electing to proceed against the undisclosed principal exclusively. We do not view *LaBella* as establishing the rule in Louisiana that a plaintiff in such circumstances may not sue *both* the agent and his principal in a single suit in order to obtain a judgment binding them *in solido*. Indeed, our examination of the Louisiana cases indicates that the rule is quite the opposite:

> The final issue in this case is the respective liability of the defendants, Dr. Hand and the Hand-Enis Realty Co., Inc. Dr. Hand contends that he was merely the agent of the Hand-Enis Realty Co., Inc., of which he was president, and, as such, incurred no personal liability. The record reflects that Dr. Hand at no time mentioned that he was an agent for the Hand-Enis Realty Co., Inc., or that it was involved in the operation of the Natchitoches Geriatrics Hospital.
>
> . . . .
>
> The evidence as a whole convinces us that Dr. Hand did not disclose, nor was Mr. Foshee aware, that Dr. Hand was acting as the agent of the Hand-Enis Realty Co, Inc. An agent who contracts for a principal without disclosing that fact is personally liable to the party with whom he contracts. The undisclosed principal is also liable.

*Foshee v. Hand-Enis Realty Co.*, 237 So.2d at 440 (affirming judgment holding agent and principal liable *in solido* on contract).

■ The *Foshee* case is directly on point. Intercon did not, as Bean suggests, proceed to judgment against Robinson and then subsequently seek to prosecute the same cause as against Bean. Intercon sued both Robinson and Bean in the same suit in order to obtain a judgment binding the two *in solido*. Just such a judgment was entered by the district court. We find no basis for concluding that Intercon elected to pursue its remedy exclusively against Robinson or in any way waived its right to proceed against Bean.

### Conclusion

For the reasons set forth above, we conclude that Robinson acted as Bean's authorized agent in the sale of the equipment in question to Intercon, and that the terms of the Robinson-Intercon contract were ratified in all respects by Bean. Bean's liability for Robinson's breach of that contract is therefore established. La.Civ.C. art. 3021.

Accordingly, the judgment below is AFFIRMED.