FORET, Judge.
General American Oil Company of Texas (Plaintiff) brought this action to recover sums allegedly owed it by defendant, the Superior Oil Company, under the terms of certain contracts entered into by them for the purpose of adjusting, between themselves, the cost of drilling an oilwell.
The trial court, after trial, rendered judgment in favor of plaintiff and against defendant, holding defendant liable to plaintiff in the amount of $334,891.54, which includes interest of $44,068.00, together with interest on the sum of $290,823.54 at the rate of 6% per annum from July 11, 1978, until paid.[1]
Defendant appeals suspensively from the trial court’s judgment and raises the following issues:
(1) Whether the laws of this State or the State of Texas govern the interpretation of the provisions of the parties’ contracts;
(2) Whether the trial court committed manifest error in finding that the oil-well drilled under plaintiff’s direction was “completed as a producer of oil or gas in commercial quantities” so as to trigger the cost adjustment provisions of a Letter Agreement between the parties; and
(3) Whether the trial court committed manifest error in finding that defendant had consented to certain operations undertaken by plaintiff in an attempt to bring the oilwell into production.
FACTS
J. P. Owen (Owen) and defendant had entered into a Joint Operating Agreement (JOA) on January 21, 1965, “. .. to provide for management, development and operation for the joint account of the jointly owned leases and the area covered thereby”. The leases referred to in the JOA were twelve oil, gas and mineral leases in which Owen and defendant each held a 50% interest. The JOA was amended on March 10, 1967, to recognize plaintiff as a party thereto by virtue of its acquisition of one-half of the interest, rights and obligations of Owen in the above mentioned leases and, in addition, to reflect the fact that the JOA had been extended to cover nine additional oil, gas and mineral leases. The interest of each party to that agreement in the twenty-one leases was set at 50% for defendant, 25% for plaintiff, and 25% for Owen.
Plaintiff, pursuant to the terms of the JOA, notified defendant by letter dated May 22, 1974, of its intention to drill an oilwell in the southeast Gueydan field (the field), Vermilion Parish, to be known as the General American-C.P. Zaunbrecher # 1 (the well). Plaintiff proposed to drill the well on a turn-key basis to a depth of 16,500 feet below the surface or through a geological formation known as the Miogyp. Sand. Plaintiff had acquired 100% of Owen’s interest in the mineral leases covering the field at this time.
Plaintiff’s original proposal for drilling the well was unacceptable to defendant and the parties then entered into a series of negotiations concerning principally the proportion of the cost of drilling the well that each would bear, and the manner and time of adjusting those costs between them should certain events occur. The negotiations culminated in a Letter Agreement dated January 17,1975, which provided that plaintiff would bear 75% of the cost of drilling the well and defendant would bear 25% of those costs, unless the cost adjustment provisions of the Letter Agreement were triggered. There were essentially two events which would have to occur to trigger the cost adjustment provisions. These events were that the well had to be “completed as a producer of oil or gas in commercial quantities” and a unit had to be established for the well by the Louisiana Commissioner of Conservation. The unit *253 would set the respective working interests of the parties in the well and provide the basis for the adjustment.
Plaintiff, as operator, contracted with the Goldrus Drilling Company to drill the well on a turn-key basis. Drilling commenced and continued until the well was drilled to a total depth of 17,006 feet. The Miogyp. sand was never encountered during the drilling operation, it either having faulted out or shaled out at that point. However, two potentially productive sands had been encountered at shallower depths, one at approximately 12,600 feet and the other at approximately 13,000 feet.
Plaintiff, by letter dated August 6, 1975, notified defendant that it would attempt to complete the well in the 13,000' sand and proceeded to do so. The well was completed at that depth some two weeks later and shut-in at a surface pressure of 7300 psi. Plaintiff then applied for a hearing before the Louisiana Commissioner of Conservation to establish units for each sand and a notice of its application was mailed to all interested parties on October 16, 1975. The hearing was held on January 13, 1976, and resulted in Orders # 797-D and 797-E, issued by the Commissioner, establishing units for each sand according to recommendations made by plaintiff. The working interest of plaintiff in the 12,600' sand was determined to be 53.125863% and 46.874137% for defendant. In the 13,000' sand, plaintiff’s working interest was determined to be 54.589023% and 45.410977% for defendant. There was no opposition expressed at the hearing to establishing the units as proposed by plaintiff and defendant did not participate therein.
Plaintiff, by telex dated February 20, 1976, informed defendant that: “THE C. P. ZAUNBRECHER WELL IS HOOKED UP AND READY TO PRODUCE.” The well was opened for production on April 1, 1976, and during the first twenty-four hours, produced 1,350,000 cubic feet of gas and 192 barrels of condensate[2] at a tubing pressure of 8,050 psi. The rate of production remained fairly constant for the first few days, but declined steadily thereafter. A month after production commenced, the well began to produce salt water. It was closed in on July 3, 1976, after surface equipment became fouled with sand produced by it. The equipment was cleaned and repaired, and the well was placed back in production on July 22, 1976. During this period of time, the tubing pressure had built up from a low of 1,650 psi, at the time the well was closed in, to 7,100 psi when it was placed back in production. The well produced 1,000,000 cubic feet of gas and 40 barrels of condensate during the first full day that production was resumed, but these rates again declined steadily thereafter. The well also began to produce both cement and sand, and was finally shut in on August 3, 1976. It has not produced from the 13,-000' sand since that time.
Plaintiff, by letter dated September 8, 1976, informed defendant that it would attempt to complete the well in the 12,600' sand and commence production therefrom shortly thereafter. However, plaintiff was unable to set a plug isolating the 13,000' sand from the well, nor was it able to clean the well out. Plaintiff finally concluded that the casing[3] had collapsed based on the fact that it was unable to set the plug and because of the continuing presence of cement in the wellbore itself. The well was never actually completed in the 12,600' sand, although it had produced significant amounts of gas and condensate from that sand during tests conducted while the well *254 was in the process of being drilled.[4] Plaintiff had billed defendant for its share of the adjusted well cost by this time, but defendant refused to pay.
Plaintiff instituted this action alleging: the existence of the Letter Agreement between it and defendant; that the well was drilled in full compliance with that agreement; that it was completed as a producer of gas and condensate in commercial quantities; that units were established by the Louisiana Commissioner of Conservation for both the 12,600' sand the 13,000' sand; that actual production of gas and condensate in commercial quantities commenced from the 13,000' sand on April 1, 1976; that, based on a survey approved by defendant, plaintiff’s working interest in the unit established for the 13,000' sand is 54.589023% and defendant’s working interest therein is 45.410977%; that under the provisions of paragraph 5 of the Letter Agreement, defendant owes plaintiff an adjustment of the cost of drilling, completing and equipping the well amounting to $321,-669.90, which sum defendant has refused to pay; and, that, under the applicable provisions of the JO A, defendant owes plaintiff interest on the principal amount due at the rate of 10% per annum from May 11, 1976, until paid. Defendant answered plaintiff’s petition denying that any cost adjustment was due under the terms of the Letter Agreement.
Plaintiff filed a supplemental petition, shortly before trial, alleging that it had incurred additional costs in connection with the well that were subject to adjustment between it and defendant, less certain credits which defendant was entitled to for salvage of materials and equipment from the well. Defendant answered plaintiff’s supplemental petition, again denying that any cost adjustment was owed to plaintiff. Defendant then plead the affirmative defense of compensation alleging that, if the trial court should find that any amounts whatsoever are due plaintiff, it is entitled to a credit for adjusted well costs through the 12,600' sand amounting to some $282,775.00.
APPLICABLE STATE LAW (TEXAS OR LOUISIANA)
Defendant contends that the trial court erred in interpreting the provisions of the Letter Agreement between it and plaintiff through the use of Louisiana law. The record clearly shows that this issue was never raised in the trial court, nor in any pleadings filed in that court. Pursuant to the provisions of Rule IX-A[5] of the Uniform Rules-Courts of Appeal, we will not review this issue.
INTENTION OF THE PARTIES
Defendant contends that the trial court committed manifest error in finding that, by their use of the term “a producer of oil or gas in commercial quantities” in the Letter Agreement, the parties intended to include within the meaning of that term, a well producing oil or gas, the value of which *255 exceeds its day-to-day operating expenses. Paragraph 3 of the Letter Agreement provides:
“3. The well will be drilled and operated by us pursuant to the Joint Operating Agreement dated January 21, 1965 between you and J. P. Owen, except that all costs incurred in connection with the well shall (subject to the provisions of paragraph 5 below) be borne and paid in the proportion of 75% by us and 25% by you. You have heretofore approved our revised A. F. E. dated November 12, 1974.”
(“US”, of course, refers to plaintiff and “YOU” to defendant.)
Paragraph 5 of that same agreement provides:
“5. If the well is completed as a producer of oil or gas in commercial quantities, an adjustment of the sharing of the costs of drilling, completing and equipping the well shall be made between you and us, so that such costs shall be borne on the basis of our respective working interests in the unit established for the well by the Louisiana Department of Conservation ; provided, however, if such completion (or a subsequent completion) is made in an horizon shallower than the Miogyp. sand, such adjusted well costs shall be limited to the cost (or a mutually agreeable depreciated cost if the well has previously been on production) of drilling said well to a depth of 100 feet below the base of the unitized horizon in which such completion is made. The cost of drilling said well below the depth which is 100 feet below the base of the unitized horizon shall be borne by the parties hereto in the proportions as set forth in paragraph 3 hereof.” (Emphasis ours.)
The trial court, on the basis of its findings, mentioned above, concluded that the well was completed as a producer of oil or gas in commercial quantities in the 13,000' sand. It noted that the well, while producing from this sand, had produced gas and condensate valued at over $100,000.00 and that this amount exceeded its day-to-day operating expenses by some $65,000.00. The trial court then went on to find that the cost adjustment provisions of paragraph 5 had come into effect as all the conditions were met, i.e., the well had been completed as a producer of oil or gas in commercial quantities and a unit had been established for it by the Louisiana Department of Conservation. Thus, the trial court held defendant liable to plaintiff for the difference between the cost it had already paid plaintiff for drilling the well 100 feet below the 13,000' sand (25% of those costs under paragraph 3 of the Letter Agreement) and its share of those costs based on its working interest in the unit established for that sand, i.e., 45.410977%.
Defendant argues that the parties intended for the term “a producer of oil or gas in commercial quantities” to mean “... a well which will generate revenues in excess of the cost of drilling, completing, equipping and operating the well”. Defendant then notes that such cost for this well exceeded $1,000,000.00 and, therefore, it cannot be considered to have been a producer of oil or gas in commercial quantities. A review of paragraph 5 shows that it makes no provision for adjusting operating costs which could be significant, if the well had to be operated for some time before it could be determined whether or not it was “a producer of oil or gas in commercial quantities” as defendant contends.
As can be expected in a case such as this, each party presented several experts who gave testimony supporting their own particular position regarding the meaning of the term “a producer of oil or gas in commercial quantities”. In addition, the trial court appointed its own independent expert whose testimony supported plaintiff’s position. We find the testimony of these experts helpful, but not decisive of the issue before us.
LSA-C.C. Article 1945 provides:
“Art. 1945. Interpretation according to intent of the parties
Art. 1945. Legal agreements having the effects of law upon the parties, none but the parties can abrogate or modify them. Upon this principle are established the following rules:
*256 First — That no general or special legislative act can be so construed as to avoid or modify a legal contract previously made;
Second —That courts are bound to give legal effect to all such contracts according to the true intent of all the parties;
Third — That the intent is to be determined by the words of the contract, when these are clear and explicit and lead to no absurd consequences;
Fourth —That it is the common intent of the parties — that is, the intention of all — that is to be sought for; if there was a difference in this intent, there was no common consent and, consequently, no contract.

(Amended by Acts 1871, No. 87)”

LSA-C.C. Article 1949 provides:
“Art. 1949. Reference to other contracts on same subject between same parties
Art. 1949. When there is anything doubtful in one contract, it may be explained by referring to other contracts or agreements made on the same subject between the same parties, before or after the agreement in question.”
The parties introduced in evidence, or attempted to do so, several prior agreements between themselves regarding the adjustment of costs for drilling other wells and the manner in which these agreements were carried out. Plaintiff’s evidence in this area related to three prior wells. For two of these wells, the cost adjustment had been made about ten years prior to the date of trial, and neither of the wells had yet produced enough oil or gas to pay all costs associated with them. For the third well, the cost adjustment had been made approximately five years prior to the time that it had produced enough oil or gas to pay all costs associated with it. These wells were drilled either under the provisions of the JO A or under a supplement to that agreement with provisions similar to those found in paragraphs 3 and 5 of the Letter Agreement.
Defendant doesn’t dispute this evidence, but it notes that two of these wells had produced for some time before plaintiff was invoiced for its increased share of the well cost, although it produced no evidence to show how long. There was evidence indicating that production was sustained from one of the wells for several years before plaintiff was invoiced for a cost adjustment. Defendant’s employees conceded at trial that if the well in question had been drilled solely under the provisions of the JO A or under no agreement at all, then defendant would owe plaintiff an adjustment for well cost. However, they attempted to show that paragraph 5 of the Letter Agreement somehow changed this arrangement by its use of the term referring to production in “commercial quantities”.
Defendant attempted to introduce in evidence an application for rehearing filed by plaintiff, among others, regarding an order issued by the Federal Energy Regulatory Commission (FERC). Defendant contends that plaintiff argued in this application that in order for a well to be considered a producer of oil or gas in commercial quantities, the evidence must indicate that the well will produce enough oil or gas to completely pay all costs associated with it and provide an adequate return on capital. The trial court, upon objection by plaintiff, refused to allow this document in evidence, finding it to be irrelevant to the issues before the court. The document was placed in the record under a proffer of proof.
For evidence to be relevant, it must have some probative value and be reasonably connected to the transaction in question. Associates Financial Services Co., Inc. v. Ryan, 382 So.2d 215 (La.App. 3 Cir. 1980); Vignes-Bombet Co., Inc. v. Rowe, 288 So.2d 889 (La.App. 1 Cir. 1973).
A review of the document sought to be introduced by defendant clearly shows that it is irrelevant and of no probative value in deciding the issues presented by this action. The document contains a challenge by plaintiff and others to certain regulations promulgated by the FERC pursuant to the Natural Gas Policy Act of 1978 (NGPA). That portion of the document *257 cited by defendant pertains to the definition of a commercially produceable “reservoir” of natural gas located “offshore” and the importance of defining that term for purposes of deciding whether to invest substantial sums in erecting offshore production facilities, or drilling additional wells to delineate the reservoir. It has nothing to do with deciding whether and when a cost adjustment provision relating to an onshore well has been triggered.
Defendant also attempted to introduce in evidence a joint operating agreement executed by it and oil companies, other than plaintiff, for the development of mineral leases offshore. Plaintiff objected to the relevancy of this document and the trial court sustained the objection. We agree. LSA-G.C. Article 1949 makes it clear that it is other contracts made on the same subject between the same parties that may be referred to for resolving anything doubtful in the contract under review. The trial court did, however, allow defendant to place two documents in evidence over plaintiff’s objection to the relevancy thereof. These were two joint operating agreements executed by plaintiff and defendant, among others, for the exploration and development of mineral leases offshore. Both agreements precisely define the term “commercial quantities”, but in the context of a reasonably prudent operator having to make the initial decision as to whether a well should be drilled. Certainly, as both plaintiff and defendant agreed, no one would drill a well unless they believed that it would produce enough minerals to cover its costs. This is simply common sense. However, this action raises no issue concerning the making of such a decision. It is apparent that the trial court accorded very little, if any, weight to these documents as it does not even mention them in its written reasons for judgment. In any event, this Court attaches very little weight to them.
Defendant cites many cases from other jurisdictions which it claims support its position as to the meaning of the term “a producer of oil or gas in commercial quantities”. We find that these cases, assuming they do support defendant’s position, are inapplicable to this action. It was repeatedly pointed out in the testimony at trial that South Louisiana is unique in that units are formed almost exclusively on a geological basis, rather than a geographical basis as is done in most other jurisdictions. Thus, when parties undertake the drilling of a well into a geological formation for which no unit has been established, there is usually much uncertainty regarding the interest in the well each will ultimately have. This is why cost adjustment provisions such as those found in the Letter Agreement are utilized.
Defendant does cite some Louisiana jurisprudence that it argues supports its position. However, a review of that jurisprudence shows that those cases involved a determination of issues related to the obligation of a mineral lessee to drill offset wells to prevent substantial drainage of oil or gas from the leased land. Certainly, in that context, one factor which must be considered is whether or not the lessee can expect to recover the cost of drilling such wells. Again, that is not the issue before us.
Finally, we note that defendant admitted that a cost adjustment was due plaintiff in certain correspondence with plaintiff that was introduced in evidence. It also recognized that a cost adjustment was due under the terms of the Letter Agreement in certain internal memoranda obtained by plaintiff and introduced in evidence.
It is our opinion that the trial court correctly found that a cost adjustment was owed by defendant to plaintiff under the provisions of the Letter Agreement.
DEFENDANT’S ALLEGED CONSENT TO PLAINTIFF’S ATTEMPTED COMPLETION IN THE 12,600' SAND
Defendant contends that the trial court committed manifest error in finding that it consented to plaintiff’s attempted completion of the well in the 12,600' sand. It argues that, pursuant to certain provi *258 sions of the JO A, it elected to go non-consent to the completion in that sand.[6]
An internal memorandum of defendant, introduced in evidence, notes that defendant did consent to the completion of the well in both sands. Further, in correspondence with plaintiff, defendant admitted that it would owe plaintiff 25% of the cost of a completion in the 12,600' sand. There is no provision in the JO A or Letter Agreement that allows a party to partially non-consent to a certain operation.
We have attempted to discern the basis for defendant’s claim that it is entitled to an adjustment in well costs through the 12,600' sand, totalling some $282,775.00, based on its alleged non-consent to plaintiff’s completion attempt in that region. Defendant’s witness, who attempted to explain the basis for its compensation claim, admitted that he was unfamiliar with the terms of the JO A, where the non-consent provision is found. We find no basis for defendant’s claim.
Our review of the record establishes that the trial court correctly found that defendant consented to plaintiff’s completion attempt in the 12,600' sand.
For the above and foregoing reasons, the judgment of the trial court is affirmed.
All costs of this appeal are assessed against defendant-appellant.
AFFIRMED.

. General provision # 5 of a document setting forth certain accounting procedures to be followed by the parties, attached to and made a part of the JOA, provides that, if a non-operator fails to pay any bills submitted to it by the operator within fifteen days after receipt thereof, the unpaid balance shall bear interest at the rate of 6% per annum until paid.

. Condensate is a light hydrocarbon liquid obtained by condensation of hydrocarbon vapors. It consists of varying proportions of butane, propane, pentane, and heavier fractions, with little or no ethane or methane.

. Casing is steel pipe placed in an oil or gas well as drilling progresses to prevent the wall of the hole from caving during drilling and to provide a means of extracting petroleum if the well is productive. Cement is pumped into the hole under great pressure to force it into the space between the casing and the wall of the *254 hole. It holds the casing securely in place once it hardens.

. A “drill stem” test was run on the well while it was still being drilled. In performing this test, the well is allowed to produce from the open hole, i.e., those areas of the wellbore not yet protected by casing. The test indicated a pressure of approximately 11,000 psi in the region of the 13,000' sand with a surface pressure of approximately 8,000 psi. The surface test data indicated that the well flowed at a rate of 2,560,149 cubic feet of gas per day and 252 barrels of condensate per day from the 13,000' sand. The test also indicated a pressure of approximately 10,000 psi in the region of the 12,600' sand with a surface pressure of approximately 5,000 psi. The well flowed at a rate of 1,975,193 cubic feet of gas per day and 108 barrels of condensate per day from the 12,600' sand.

. “RULE IX-A. SCOPE OF REVIEW
The scope of review in all cases within the appellate and supervisory jurisdiction of the Courts of Appeal shall be as provided by Art. 5, § 10(B) of the Louisiana Constitution of 1974 and Article 2164 of the Louisiana Code of Civil Procedure. Ordinarily, however, the Courts of Appeal will review only issues which were submitted to the trial court and which are contained in the specification of errors in the briefs or in an application for writs, unless the interest of justice clearly requires otherwise. Adopted, effective Dec. 1, 1977.”

. The non-consent provision referred to essentially provides that a party could elect not to participate in certain operations undertaken by another party to the agreement by simply remaining silent for a certain period of time after being notified by the other party of the actions it planned to take along with certain other information. If the action was undertaken and the well eventually produced hydrocarbons, the party performing the operation was allowed to keep an increased share of the production as a penalty against the party who had non-consented.