**RIVERCITY**

v.

**AMERICAN CAN COMPANY.**

**Civ. A. No. 78–1014.**

United States District Court,
E.D. Louisiana.

April 12, 1984.

Sidney W. Provensal, Jr., New Orleans, La., for plaintiff and The French Eighth.

Monroe & Lemann, Jerry A. Brown, A. Justin Ourso, III, New Orleans, La., for American Can Company.

Milling, Benson, Woodward, Hillyer & Pierson, John C. Christian, James K. Irvin, W. Richard House, Jr., New Orleans, La., for Whitney National Bank of New Orleans.

## OPINION

ARCENEAUX, District Judge.

Plaintiff, Rivercity, a Louisiana ordinary partnership, instituted this removed diversity-based suit against American Can Company ("American"), a New Jersey corporation, with its principal place of business in a state other than Louisiana, seeking damages for alleged breach of contract.

Rivercity claims to have lost $2,777,-128.44 as a result of American's failure to honor an option on certain real property in New Orleans on which the Jackson Brewery, owned originally by Jackson Brewing Company ("Jax"), was located. American subsequently filed a third party complaint against French Eighth, a Louisiana ordinary partnership, for indemnity and contribution.[1] A further exposition of the facts is set forth *In the Matter of Jackson Brewing Co.,* 567 F.2d 618 (5th Cir.1978). This litigation is no stranger to the courts of this district.

---

1. The French Eighth Partnership was comprised of the same partners, holding the same partnership interests, as plaintiff. French Eighth purchased properties owned by Jax which were located on the lakeside of Decatur Street in a cash sale on January 1, 1971.

A trial before the Court without a jury commenced on June 27, 1983. The Court deferred ruling on defendant's motion for involuntary dismissal under Fed.R.Civ.P. 41(b), and, at the close of all evidence, took the entire matter under submission. Having throroughly reviewed the evidence, the transcript, the memoranda of counsel and the applicable law, the Court now rules that:

1. American's motion for involuntary dismissal is denied; and

2. Judgment will be entered in favor of defendant and against plaintiff, for reasons hereinafter set forth;

3. American's third-party claims against French Eighth partnership are dismissed as moot.

## FACTS [2]

Prior to December 9, 1970, the Jackson Brewing Company had been essentially a family business, owned and operated by the Fabacher family of New Orleans. Its principal product was a widely consumed beer bearing the brand name "Jax". On December 9, 1970 the Fabacher family sold all of the outstanding brewery stock to JBC Inc., a corporation whose stock was wholly owned by a Mr. and Mrs. James Howard. Shortly thereafter, allegedly on January 1, 1971, Jax granted an option to Rivercity to purchase a certain parcel of real property located on the riverside of Decatur Street in the French Quarter, then owned by Jax. The recited consideration for the option was $1,000 (Exh. RC 1). The option could only be exercised during the period January 1, 1975—January 31, 1975. The stated purchase price in the option was stated to be $2,777,128.44. The Rivercity partnership was comprised of Thomas C. Farrell, Jr., Paul A. Nalty, Margaret A. Perez [3] and JBC, Inc. Farrell and Nalty were designated managing partners of Rivercity. They were also members of the

Board of Directors of Jax at the time the option was granted. Nalty, an attorney, held partnership status in a New Orleans law firm which was counsel for Jax, Rivercity and JBC, Inc. and French Eighth. (Tr. 140–144).

The relationship between American and Jax at the time the option was allegedly granted was that of supplier and customer; American supplied containers to Jax into which Jax placed its beer. In fact, Jax was a major customer of American in the New Orleans area. Therefore, when in early 1970 Jax began to have financial problems, American allowed it to defer payments. Later, when Jax needed to borrow over $5 million to pay the National Bank of Commerce which had financed the JBC, Inc. acquisition of the brewery's stock, American "introduced" Jax to the Whitney National Bank (Whitney).[4] Thereafter, on September 8, 1971, the Whitney loaned $5.2 million to Jax. This loan, was secured by pledges of the Jax stock, and security interests in both the movable and immovable property owned by Jax. In making the loan to Jax, the Whitney asked for and received a "take-out" commitment from American which in effect provided that should the Whitney become "uncomfortable" with the Jax loan, American would "take-out" the Whitney. (Exh. RC 23).

Also on September 8, 1971, certain letters were exchanged between the Whitney and Rivercity (Exhs. RC 13 and 14). These letters represent the basis of plaintiff's claim.

Plaintiff maintains that these letters, which contain identical language regarding Rivercity's right to purchase "real property" owned by Jax, contractually obligated American to honor the option granted by Jax to Rivercity.

---

2. The facts relating to the transactions affecting the parties to this action are many and complex. Only the essential transactions affecting this action are noted here.

3. Margaret A. Perez later withdrew from the Rivercity partnership.

4. The term "introduction" may be misleading. The Whitney, had in fact been the bank of Jax before the JBC, Inc. buy-out.

In May of 1974 the Whitney expressed its lack of comfort with the Jax loan, and requested that American fulfill its take-out promise. American promptly complied, became substituted by assignment from the Whitney as the Jax creditor, and thereby acquired the bank's first lien position as to the collateral securing the loan. By June 3, 1974, the financial condition of Jax had further deteriorated. American called the loan and proceeded against the Jax stock, pledged as collateral. American subsequently acquired all of that stock as the only bidder at a public foreclosure sale of the stock, and thereby became the sole stockholder of Jax.

On November 13, 1974, Jax was adjudicated a bankrupt. On January 31, 1975 the trustee in bankruptcy was notified in writing that Rivercity was exercising its rights under the option. The trustee rejected the option as a burdensome, executory contract. That rejection was upheld. *In the Matter of Jackson Brewing Co., supra.*

Thereafter, on May 2, 1978, American bought the property in question from the trustee in bankruptcy for $5.5 million in debt receipts. On February 6, 1982, American sold the property to a third party for $5.55 million.

Plaintiff sued American in state court on March 2, 1978; the case was removed to this court on March 29, 1978.

Rivercity's complaint alleges that American breached obligations originally undertaken by the Whitney in connection with the above referenced loan; Rivercity claims that the Jax-Whitney loan was at all times, essentially a Jax-American loan, because the Whitney was American's agent, thus binding American under applicable principles of Louisiana agency law.

American denies any agency relationship with the Whitney, but alternatively asserts that even if there were, the so called option agreement was null and void from the beginning.

The Court turns first to the agency claims.

### NO AGENCY—NO CONTRACT

A letter of September 8, 1971 from the Whitney[5] to Rivercity contains the following language: (Exh. RC 13)

"Whitney and Jackson specifically take cognizance of the fact that the rights of Rivercity to purchase "real property" as described in the option are now and shall remain at all times hereafter superior to and shall prime any and all rights of Whitney under the Act of Collateral Mortgage, and the Note paraphed for identification therewith, and the Act of Subordination.

Plaintiff maintains that the Whitney was the agent of American and that therefore American is bound by the obligation expressed in the letter.[6]

Though there is clearly no reference to American in this document, Rivercity maintains that it was generally acknowledged among all parties, including American, that the agreement was to bind all of them. Rivercity acknowledges that there was no express mandate establishing an agency relationship between American and the Whitney, but it nevertheless maintains that such a relationship did, in fact, exist and can be established through application of other jurisprudentially recognized principles—namely implied agency, apparent agency and ratification. Plaintiff has correctly identified phraseology which has

---

5. As originally filed this suit named both Whitney and American as party defendants. However, by order entered on January 7, 1980 this Court dismissed the Whitney on the grounds that Rivercity had failed to state a valid claim against it. The Court found that, assuming Whitney had acted as agent of American under La.Civ.Code art. 3012, Whitney was not personally liable for actions taken in its capacity as agent. In a related finding the Court also held

that the Whitney had not breached any contractual obligation it owed to Rivercity.

6. In a second order issued on July 13, 1978, at request of counsel for American, the Court clarified the January 7 ruling and held that "no factual finding relative to Whitney National Bank's status as a disclosed agent for American Can Company was made by the Court in its January 7, 1980 ruling."

meaning within Louisiana agency law, or more properly, the Louisiana law of mandate—but for simplicity herein, referred to as "agency". However the use of these phrases is, at best confused.

■ Under Louisiana law, an agent is one who acts for or in the place of another by virtue of authority from the latter. *Intercontinental Engineering Mfg. v. C.F. Bean*, 647 F.2d 621, 628 (5th Cir., 1981). *Craft v. Trahan*, 351 So.2d 277, 281 (La. App. 3rd Cir.1977). Generally, agency law is applied where an actual agency relationship is in existence, that is, when there has been a meeting of the minds between agent and principal regarding the creation and scope of the agency. Agency may be either express or implied but it nevertheless is actual and binds both parties. *Busby v. Walker*, 84 So.2d 304, 307 (La.App. 2nd Cir.1955), writ denied. *Broadway v. All-Star Insurance Company*, 285 So.2d 536 (La.1973).

In the instant case plaintiff concedes that there is no evidence of an express or formal establishment of agency between the Whitney and American. Plaintiff maintains, however, that there was an implied agency in existence, that is, an actual agency, created by the circumstances. It bases that claim on the testimony of Ed Jackson, local credit manager for American, and on correspondence between Jackson and counsel for American.[7]

■ At trial, Jackson testified that he had no recollection of seeing either the original option agreement or the September 8 letter from the Whitney to Rivercity nor could he recall ever being asked to ratify the September 8 letter. (Tr. 345–346). Under cross-examination he admitted signing a document marked "Receipt", dated May 22, 1974, (Exh. RC 44) wherein American acknowledged receiving the promissory notes of Jax from the Whitney as a result of the American "take out". This receipt document itemizes the various notes and agreements affecting the original loan to Jax. One of the items listed was the letter of September 8, from the Whitney to Rivercity. Jackson also stated that he doubted he had seen the original loan agreement between the Whitney and Jax before September 8, 1971, though he could not say definitely when he had first seen it. (Tr. 356) This court finds that Jackson's testimony simply does not provide plaintiff with the requisite substantive evidence that there was an implied agency in existence between the Whitney and American at any time.

Plaintiff also relies on correspondence between counsel for American and Ed Jackson. (See Exhs. RC 33 and 34.) These letters, exchanged in early December, 1972, make reference to certain loan agreements dealing with the Jax transaction. They contain language attributed to Jackson which Rivercity interprets as indicating Jackson's belief that counsel for American was responsible for the "actual work on this original loan agreement." (Exh. RC 34).

These letters are the strongest evidence which plaintiff presents to establish an implied agency because they indicate that American may have at least assisted in structuring the loan agreement between Jax and Whitney. This court finds, however, that this evidence, even if read in conjunction with the Jackson "receipt" evidence referred to earlier herein, fails to preponderate that the relationship between the Whitney and American was that of agent-principal. This finding is based on two grounds.

■ First, in Louisiana the essential test for determination of an actual agency, either express or implied, is whether the principal has the right to control the con-

---

7. American had claimed that this correspondence, (Exhs. RC 33 and 34) as well as other evidence introduced by Rivercity, was protected under the attorney client privilege and the related attorney work product privilege. All of the documents in dispute were reviewed by Judge Charles Schwartz, Eastern District of Louisiana, who recommended that this particular correspondence not be protected under either privilege. Judge Schwartz's recommendation was adopted for purposes of trial.

duct of the agent and whether the agent has the right and authority to represent or bind the principal. *Craft, supra* at 281. Though the court recognizes that an agency may be established by a party's conduct, even though the principal may not have intended to create one, *Craft, supra,* it is nevertheless crucial that the requisite degree of control be established in order to find that an actual agency existed. As a factual matter, this correspondence presented by plaintiff simply fails to demonstrate that American exercised or had the right to exercise that degree of control over the Whitney which the relevant law requires.

■ Second, the September 8 letter, which forms the basis of plaintiff's complaint, does not refer at all to American, as either a principal or even as a guarantor. The court notes that one who deals with an agent is put on his guard when the agent acts in his name alone and that one who deals with such agent does so at his own risk. Plaintiff, who here relies on the agency, bears the burden of inquiry to ascertain the nature and extent of the agent's powers. *Carey Hodges Associates, Inc. v. Continental Fidelity Corporation,* 264 So.2d 734 (La.App. 1st Cir.1972). *Buckley v. Woodlawn,* 233 La. 662, 98 So.2d 92 (1957). There is no evidence to indicate that plaintiff inquired as to the agent-principal status of the Whitney and American, such that plaintiff could reasonably rely on correspondence from the Whitney, alone, as binding American.

■ Plaintiff is likewise unable to show an apparent agency, or, as it is sometimes called, agency by estoppel. "Agency by estoppel", it must be noted, is not based on actual agency but instead is generally found under circumstances where third parties have been led to believe that an agency relationship was in existence and have relied on that belief to their detriment. Those parties then who have held out that there was an agency relationship in existence are estopped from denying same. *Busby, supra.*

■ Thus, this species of agency arises when a principal, by his act or conduct, has knowingly caused or permitted another to appear as his agent, to the detriment of third parties who have acted in reliance thereon, in reasonable prudence and in good faith *Thompson v. Great Midwest Fur. Co.,* 395 So.2d 840 (La.App. 1st Cir. 1981).

■ In the instant case there has been absolutely no showing that American ever acted in such a manner so as to justify a belief by Rivercity, or to otherwise create any appearance sufficient in law, that the Whitney was American's agent for purposes of the September 8 letter, or for any other transaction.

Rivercity also suggests to the court that the agency notion of ratification binds American to the Whitney's obligation as set forth in the letter of September 8. In this regard plaintiff relies specifically on language in letters from American personnel to the Whitney in which American agreed to "ratify all actions you (Whitney) have taken in connection with this transaction."

■ There are two problems with this "ratification" theory. First, in each of the cases cited to the court by plaintiff, the agency relationship was already established before the ratification issue was raised. Thus, ratification in this context presupposes some agency relationship; for example it would be appropriate where an agent has acted outside the scope of his authority, but where the principal, with knowledge, does not repudiate the act. *Bamber Contractors v. Morrison Engineering,* 385 So.2d 327 (La.App. 1st Cir. 1980).

■ Ratification is not a separate basis for establishing the existence of an agency relationship. Rather, it is generally applied to broaden the scope of a previously-established agency arrangement. *Bamber, supra.*

■ Additionally, it is far from clear that a "ratification" of the type and nature relied on by Rivercity would be sufficient to bind American to the September 8 "com-

mitment" to Rivercity by the Whitney. To find ratification, the facts must indicate a clear and absolute intention to ratify; no such intent will be inferred where the alleged ratification can be explained in some other way. *Nationwide Finance Co. of Gretna, Inc. v. Pitre*, 243 So.2d 326, 327 (La.App. 4th Cir.1971). The document which Rivercity relies on as proof of ratification is a letter from John Hirschauer, general credit manager for American, to the Whitney. The letter makes specific reference to the original take-out commitment which was given to the Whitney, to the release of James W. Howard and JBC, Inc. as obligors, and to an additional advance of $500,000.00 made by the Whitney to Jax, after the original loan package was completed. At the close of the letter, Hirschauer notes that "we further agree that we have been advised of and ratify all other actions you have taken in connection with this transaction." The letter does not make any reference to the Rivercity option or any Whitney obligation to honor the option.

The language of this letter does not support a holding that American had a clear and absolute intent to ratify any act the Whitney may have taken with regard to Rivercity. This Court is persuaded that the purpose of this ratification letter is best explained as a waiver of any rights American would have otherwise had against the Whitney as a result of the release of Howard and JBC, Inc. from their obligations as guarantors of the Jax loan, and to the $500,000 increase in the debt, which took place after the confection of the loan documents, including American's obligation to "take out" the Whitney. Language of this nature would have been desirable, if not absolutely necessary, lest the release of an obligor or obligors and an increase in the amount of the debt furnish American grounds to "back away" from its guaranty. See La.Civ.Code Arts. 3037 and 3061; *Wilson v. Brian*, 81 So.2d 142 (La.App. 2nd Cir.1955). The letter specifically addresses those issues and the Court finds its purpose to be precisely that.

To succeed in a breach of contract action, plaintiff must first demonstrate that a contract was in existence. Under La.Civ.Code art. 1779, consent is clearly a required element of a contract. Plaintiff's failure to establish the existence of an agency relationship between American and the Whitney and thus bind American to any obligations existing between the Whitney and Rivercity is fatal to its claim; plaintiff has shown no other way to link American to what Rivercity claims is an obligation in its favor undertaken by the Whitney, as expressed in the September 8 letter.

## II. NO BREACH

It is also clear that any benefit flowing to Rivercity by virtue of the September 8 Whitney letter could not have affected much less improved any of the substantive rights or obligations expressed in the original option contract between Rivercity and Jax. Theoretically, the September 8 agreement was executed solely for the purpose of assuring performance on the original option. That option contract severely limited the purchase rights of Rivercity to the exercise of option rights to the period January 1, 1975, to January 31, 1975. During this period, Jax was in bankruptcy.

It is well established that contracts have the effect of law upon the parties and that courts are bound to give legal effect to such agreements according to the true intent of all the parties. La.Civ.Code art. 1945. *Pendleton v. Shell Oil Co.*, 408 So.2d 1341 (La.1982). The terms of the option agreement between Rivercity and Jax are clear and unambiguous. Subsection (B)(2) of that agreement provides specifically that Rivercity may not give written notice of intention to exercise the option before January 1, 1975 and that such notice must be given on or before January 31, 1975. Obviously, Rivercity is not entitled to any more rights than those which it acquired with the option, assuming arguendo that the option itself was valid. Any obligation of performance on the part of

Jax was transferred to the trustee in bankruptcy, subject to the supervision of the Bankruptcy Court. That Court's rejection of the option contract was affirmed. *In the Matter of Jackson Brewing Co., supra.*[8]

Thus, even had Rivercity been successful in establishing an agency relationship between the Whitney and American, Rivercity is unable to cross the threshold of a crucial second step in this action, a breach of contract by American. Clearly, even assuming a proven agency, American could not be held responsible for any breach of an obligation which, through no fault of its own, it had no power to perform. This was the effect of the opinion of the reorganization Court, which was affirmed by the Fifth Circuit *In the Matter of Jackson Brewing Co., supra.* Under this analysis, there is no "... controversy between American and Rivercity which is ripe for decision." (See Footnote 13, *Matter of Jackson Brewing Co., supra.*) The cleansing bath of bankruptcy has washed away any otherwise available remedy based on breach of the option contract.

### III. NO OPTION

Finally, the Court concludes that under no circumstances would Rivercity be entitled to claim damages for breach of the option contract on the basis of the September 8, 1971 Whitney letter, or otherwise, because the option agreement between Rivercity and Jax is void.

### A. BANGOR PUNTA

■ The Court notes that Rivercity has asserted that the *Bangor Punta* doctrine bars American from attacking the validity of the option agreement. This essentially equitable doctrine denies stockholders the right to seek damages from former directors for corporate mismanagement when claimants' stock was acquired by them with knowledge of the prior miscon-

duct. *Bangor Punta Operations v. Bangor & A.R. Co.,* 417 U.S. 703, 94 S.Ct. 2578, 41 L.Ed.2d 418 (1974). The clear thrust of that decision was to deny subsequent shareholders what would otherwise be an unjust enrichment where the harm was done before such stockholders acquired their shares. *REA Express, Inc. v. Travelers Ins. Co.,* 406 F.Supp. 1389, 1393 (D.D.C. 1976), aff'd in part, modified in part, 554 F.2d 1200 (D.C.Cir.) writ denied, 434 U.S. 858, 98 S.Ct. 182, 54 L.Ed.2d 131 (1977).

■ The Court finds that *Bangor Punta* is inapplicable for two reasons.

First, Rivercity's contract claim against American arises out of the September 8, 1971 letter. At that time, American owned no stock in Jax. The public sale at which American acquired the stock did not take place until June 3, 1974. *Bangor Punta* by its own terms could not be applied to bar American from attacking an option granted prior to its stock acquisition. Thus, since *Bangor Punta* has not stripped American of its right to attack the original option, by no stretch of the imagination (or the *Bangor Punta* rule) could that essentially equitable doctrine deny to American the right to defend against option-based claims. Particularly is this true under circumstances such as these, where American became a Jax shareholder only by virtue of its prior position as creditor and by virtue of a stock acquisition resulting from a public sale under order of Court.

Second, as indicated above, the thrust of *Bangor Punta* is to deny unjust enrichment which might otherwise occur when those who buy stock at a price reflecting pre-purchase corporate misconduct, seek to convert that price into a profit-producing claim for damages.

Rivercity's effort to use the *Bangor Punta* shield as a sword is perhaps the ultimate irony. The facts are that Jax was indebted to American for at least $6 mil-

---

**8.** The Fifth Circuit avoided ruling on the controversy which is now before the Court. In affirming the Bankruptcy Court's rejection of the Rivercity option that Court noted that the Bank-

ruptcy Judge properly resisted an attempt by Rivercity to litigate its dispute with American in that forum.

lion. (Exh. RC 39). Major assets of Jax were the proceeds of the sale of the property which Rivercity claims by virtue of the option. It is not disputed that Rivercity's total investment in the option transaction was what it may have paid for the option, allegedly $1,000. As between the parties, American and Rivercity, the facts eloquently answer the questions of equity and fair play, which are the foundation stones of *Bangor Punta.*

## B. THE HEART OF THE MATTER

More importantly, however, even if the Court should assume that American breached some contractual obligation to honor Rivercity's option, it soon becomes clear that the option is so rife with deficiencies and corporate irregularities as to make it unenforceable and void. These deficiencies include failure to prove that even the meager consideration stated in the option was ever paid; failure by the Jax directors to observe even rudimentary corporate formalities; total disregard of the Louisiana Business Corporation Law requirements dealing with voting by "interested directors" and, finally, flagrant breach by certain Jax directors of the fiduciary duty which every director owes to the corporation by virtue of his position on the board.

The Court will treat these seriatim:

1. Plaintiff has failed to prove, as required by Louisiana law, that the consideration recited in the option was ever paid. La.Civ.Code art. 2462, *Moresi v. Burleigh,* 170 La. 270, 127 So. 624 (1930). At trial, Rivercity entered into evidence a check for $1,000 payable to a New Orleans law firm. The check was drawn on the account of the French Eighth, another partnership whose interests, as noted above, were held by the same persons who held similar interests in Rivercity. Not only was that law firm general counsel for Jax, but it also represented Rivercity, French Eighth, and JBC, Inc. simultaneously. The check itself bears no reference or representation regarding payment, and is dated May 4, 1971.

In maintaining that this check was the consideration paid for the January, 1971 option, Rivercity tenuously explains that this amount was paid to the law firm in reimbursement for another check which the law firm had issued to Jax in payment for the option. This was done, it is alleged, because Rivercity did not yet have a bank account. Not only is this contention unsupported by evidence of any subsequently opened bank account, or reimbursement by Rivercity to French Eighth, it lacks credibility when the credentials of the players are reviewed.

In this regard, the Court takes notice of the fact that the managing partners of Rivercity are not naive, wide-eyed country bumpkins intimidated at the prospect of opening a checking account. On the contrary, they were and are, seasoned, shrewd businessmen, astute enough to negotiate an option which, in itself, was extremely valuable, at a final purchase price which, by any account, would produce a profit of over a million dollars. The explanation advanced by Rivercity is simply unsatisfactory and falls short of establishing by a preponderance of the evidence that the consideration recited in the option was in fact ever paid.

Even had plaintiff succeeded in proving that the $1,000 was paid, this court has serious doubts as to whether that amount was adequate to bind Jax to the option. However, this analysis would involve an application of the "serious consideration" rule of La.Civ.Code art. 2464 to the controlling article on options, La.Civ.Code art. 2462. Since this issue of law remains an open one in Louisiana, and since its resolution is not necessary to the result herein reached, the Court will avoid the temptation presented to plow new ground and hold that $1,000, even if paid, could hardly be deemed "serious consideration," adequate to remove a multi-million dollar parcel of New Orleans commercial French Quarter riverfront real estate from the market for a period of some five years.

2. It is further clear that the subject option was not confected in proper observ-

ance of the formalities attendant to corporate transactions.

■ Louisiana law requires that the authority to act on behalf of a corporation must be evidenced by the corporate charter or by a resolution of the Board of Directors. LSA–RS 12:81, 82; *Margolis v. Allen Mortgage & Loan Corp.*, 268 So.2d 714 (La.App. 4th Cir.1972). The option dated January 1, 1971, was signed on behalf of Jax by Ben Sisson, then Chairman of the Board of Directors of Jax.[9] While plaintiff concedes that the Jax Board of Directors never passed a valid resolution authorizing Sisson to enter into the option agreement, it contends that the option was properly ratified at a September 1971 board meeting. However, it is clear that LSA–RS 12:84 bars Rivercity's reliance on that ratification to satisfy the corporate formality rules.

LSA–RS 12:84 A sets forth the standards governing transactions between a corporation and a director of that corporation. This so-called "interested directors" statute provides in pertinent part that such transactions are neither void nor voidable if:

1. The material facts as to his (the director's) interest as to the contract or transaction were disclosed or known to the Board of Directors or the committee, and the board or committee *in good faith* authorized the contract or transaction by a vote sufficient for each purpose without counting the vote of the interested director or directors; or

2. The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon and the contract or transaction was approved *in good faith* by vote of the shareholders; or;

3. The contract or transaction was *fair* as to the corporation *as of the time it was authorized, approved* or *ratified* by the board of directors, committee, or shareholders. (Emphasis added)

In ruling on the validity of transactions between directors and their corporations, Louisiana courts have adopted the "rigorous scrutiny" standard identified in *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939). A landmark case in Louisiana on this issue is *Noe v. Roussel*, 310 So.2d 806 (La.1975). The *Noe* court made it clear that the burden of establishing the validity of the transaction itself falls squarely on the director.

That court characterized the director's burden in the following way:

> We hold, therefore, that an agent who acquires his principal's property, or one who otherwise acts in a fiduciary capacity, bears the burden of establishing that the transaction was an arm's length affair. This means that the agent or fiduciary must handle the matter as though it were his own affair. It also means the agent or fiduciary *may not* take even the slightest advantage, but must zealously, diligently and honestly guard and champion the rights of his principal against all other persons whatsoever, and is bound not to act in antagonism, opposition or conflict with the interest of the principal to even the slightest extent. *Noe, supra*, at 819.

Plaintiff relies on the disjunctive language of the three paragraphs of LSA–RS 12:84 A and maintains that, notwithstanding the undeniable intent of the *Noe* court, the transaction between Rivercity and Jax is in technical compliance with both subsections 1 and 2, and that plaintiff has therefore satisfied the burden it must carry. Plaintiff, in this regard, does not rely on subsection 3.

■ Plaintiff's argument places squarely before this court a question which has apparently not been directly addressed by Louisiana judicial interpretations of LSA–RS 12:84 A: Can a director, by mere disclosure, validate a transaction which would otherwise be, in fact, unfair to the corpora-

---

**9.** At trial, plaintiffs admitted that the option itself was not signed on January 1, 1971, and in fact did not take effect until early May, some

five months later. The Rivercity partners explained simply that they wanted the option contract "to speak in terms of January 1, 1971."

**920**

tion. Although no Louisiana court has yet found it necessary to turn this virgin corporation law soil, California courts have interpreted statutes which are nearly identical to LSA–RS 12:84 A and have clearly rejected the argument advanced by plaintiff. *Remillard Brick Co. v. Remillard-Dandini Co.*, 109 Cal.App.2d 405, 241 P.2d 66 (1952). See also Note, "Corporations, Fiduciaries, and Conflicts of Interest," 36 La.L. Rev. 320 (1975). This Court does likewise. The clear rationale of the *Noe* decision and other well established case law in Louisiana, as well as the clear terms of the statutory fiduciary duty which a director owes to his corporation,[10] lead this Court to but one conclusion: a purgative disclosure cannot remove the taint of unfairness or self-serving opportunity and thus permit a director, or a group of directors, to advantage themselves at the cost of the corporation upon whose Board of Directors they serve. "Consent" secured by the blandishment of disclosure does not justify, excuse, or permit an economic assault upon a body corporate by one of its directors. A fiduciary—duty bound director cannot absolve himself of that duty by admitting his self serving designs. Indeed, such candor, it could be well argued, may well violate the vote of the "remaining" directors since a full disclosure of a disadvantage in corporate disposition may signify a fiduciary violation on their part, since the statute, in any event, requires that the board authorize transaction "in good faith." *Noe, supra; House of Campbell v. Campbell*, 172 So.2d 727 (La.App. 4th Cir.1965), *Crescent City Brewing Co. v. Flanner*, 44 La.Ann. 22, 10 So. 384, 385 (1891). However, even had plaintiff been successful in persuading the court that an unfair transaction may nevertheless be authorized by "uninterest-

ed" corporate directors after full disclosure, Rivercity is not entitled to rely on this portion of the statute, since by it's own admission, the Jax Board of Directors *ratified*, as opposed to *authorizing*, the option agreement.

The only part of LSA–RS 12:84 A which refers to a *ratification* by the Board of Directors as validating an insider's transaction is paragraph 3, which also requires that the contract be "... fair as to the corporation as of the time it was ... ratified ...".

The respective subsections of the statute have been deliberately structured to require disclosure of a director's interest at the time a contract is *authorized* in good faith by the Board of Directors, with the fairness test imposed in the event of a *ratification.* The differences are genuine and realistic. Disclosure prior to authorization permits the issue of fairness to be ventilated at the meeting, where discussion can catalyze the appropriate Board response. Even here, however, the statute requires that the disinterested directors authorize the action "... in good faith ...".

█ Ratification occurs after the "horse has left the barn", or, at least, after some action has been taken by a corporate officer or agent. Hence, the statute requires that a post-event review of action taken under the pressure of past circumstances disclose that the contract be "... fair ..." Rivercity has not attempted to show that the transaction was fair to Jax at the time it was granted and the Court doubts that it could do so if it tried.[11] The "ratification" is therefore ineffective. Rivercity urges, however, that even if the requisites of paragraph 1 of LSA–RS 12:84 A were not met, the shareholders of Jax ap-

---

**10.** LSA–R.S. 12:91 sets forth the fiduciary duty owed under these circumstances. It provides: "Officers and directors shall be deemed to stand in a fiduciary relation to the corporation and its shareholders, and shall discharge the duties of their respective positions in good faith, with that diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions..."

**11.** As observed by the Fifth Circuit, "Rivercity has assiduously avoided explaining how an option granted for five years for a consideration of $1,000 to purchase land—worth at least $5.1 million—for $2,777,128.44 could be anything but an onerously burdensome contract to the Jackson estate no matter who, secured or unsecured creditors, ultimately benefits from the rejection." *In the Matter of Jackson Brewing Co., supra,* at 621.

proved the option, and their absolution purged any stain of earlier sin.

LSA–RS 12:84 A(2) allows shareholders to approve an "interested directors" transaction provided that the material facts are disclosed or known to the shareholders and that they nevertheless approve a transaction in "good faith".

Initially the court notes that the statute clearly contemplates a different factual scenario than is present in this case. James Howard, with his wife owned all outstanding shares of JBC Inc. JBC Inc., owned 99% of the Jax stock. JBC Inc. was also "interested" in the Rivercity option, for JBC, Inc. was a Rivercity partner. Indeed Jax director and Rivercity partner Farrell testified that Howard had made his approval of the option contingent upon JBC, Inc. being included in the Rivercity partnership. The agreement between Farrell, Nalty and Howard concerning the ultimate option transaction was made before Howard, through JBC Inc., made the tender offer which resulted in the Howard interests acquiring Jax outstanding stock. At that time, Farrell was on the Jax Board and it was he who recommended to the Fabacher family that they sell to Howard by way of JBC Inc.

■ Certainly, a plain reading of the statute indicates that it is designed to apply to situations where *stockholders* are disinterested. For this reason alone, there is grave doubt as to whether this section of the statute is available as a cleansing agent.

In any event, the statute requires that not only must officer-director interest in a transaction be disclosed to the shareholders, any such shareholder approval must be "in good faith."

■ Relevant events at the time call into question the "good faith" of Howard who, through JBC, Inc., was voting 99% of the Jax stock. Howard did not appear or testify at trial—his whereabouts are said to be unknown. However, the trial testimony and a review of the Jax bankruptcy proceedings reveal that Howard's vote as a shareholder in approving the Rivercity option could under no circumstances be deemed "in good faith". From December 7, 1970, the date JBC, Inc. acquired the Jax stock, until June 7, 1972, when that stock was sold, Howard maneuvered Jax and JBC, Inc., so that approximately $14 million was transferred from Jax to JBC, Inc. The tender offer itself—which was, in effect, paid for with Jax assets,—amounted to only $11.5 million. Thus JBC, Inc. acquired the equivalent of some $2.5 million in Jax assets, to say nothing of a ⅓ interest in each of the Rivercity and French Eighth partnerships, which took "bargain basement" long term options on Jax's valuable French Quarter properties. The funds which were upstreamed by Jax, to JBC, Inc. were styled as 'loans' but they were represented by unsecured, non-interest bearing JBC notes. (See Tr. 326–327). Through this process, Jax, a corporation already struggling when purchased from the Fabachers, was effectively bled white. As a result of Jax's subsequent failure, its creditors including American and the Jax employees pension funds, lost heavily. Thus, even a cursory review of the facts casts a cloud of doubt over the entire series of transactions sufficient indeed for the Court to find that Howard et al's "shareholder approval" was not in good faith.

■ Rivercity, of course, reads LSA–RS 12:84 in a different way, but the Court notes that the validating provisions of paragraphs A(1) through A(3) do not stand alone. They are integral, but component parts, of a clear statutory scheme, designed to permit corporations to deal with "insiders" if certain conditions are met. But even literal compliance with those conditions is not absolute, for the statute, in effect, declares that what would otherwise be an interest tainted insider transaction shall not be "... void or voidable *solely* because the common or interested director or officer was at or participated in the meeting ... or *solely* because his or her vote were counted for such purpose, *if* ...." one of the three alternative methods

of authorization/approval/ratification are met. (Emphasis added).

Thus, "interest" cannot provide the "sole" grounds to void a corporate-insider transaction if the requisite statutory approvals are given—but other grounds to nullify such transactions may well be present, i.e. lack of good faith and fairness, respectively, and if so, would not be affected by the "purge" provisions of LSA–RS 12:84 A.

 Indeed, such is the case at hand. It is clear beyond peradventure that the directors of Jax who were also partners in Rivercity breached the most fundamental duty a director owes to his corporation. Directors are fiduciaries as to their corporations, and are required to discharge the duties of their position in good faith and "with the diligence, care, judgment and skill which ordinarily prudent men would exercise under similar circumstances in like positions" LSA–RS 12:91, *supra*.

*Noe, supra,* places the burden of proving compliance with the statutory standard squarely upon a director who chooses to do business with his corporation; the *Noe* court cites approvingly the language in *House of Campbell, supra,* to the effect that because of the fiduciary relationship between a director and his corporation, an interested director bears the burden of proving his good faith in entering into the transaction as well as the inherent fairness of such transaction from the standpoint of the corporation. *Noe, supra* at 819.

The partners-directors acted in clear disregard of the statutory duty they owed to Jax. Neither have carried the burden of proving the *Noe*-endorsed and statutory requirements of good faith and fairness. Although both were keenly aware of the precarious financial situation of the brewery, both participated in a transaction having as its obvious purpose securing an advantage to their partnership, Rivercity,— i.e., long term option rights to Jax riverfront real property secured at bargain basement prices—at the cost of an already troubled Jax. A key factor in successfully negotiating this real estate coup was their presence on the Jax board of directors where they held positions of influence over corporate activities and decisions. Indeed, the corporate records indicate that both voted for the Rivercity option when it was first brought before the Board although they abstained on a ratification vote several months later. This Court finds that both partners used their positions on the Jax Board as a means of securing an advantageous real estate proposition for their partnership, Rivercity. Indeed, one testified frankly at trial that he never believed that any regional brewery had any long range capability, "and all we were interested in was the real estate, and everybody involved in the transaction knew that." (Tr. p. 173.)

 While the Court cannot help but admire this witness' candor, it nevertheless illustrates the problems basic to Rivercity's case. A corporation, particularly a troubled one, is not a piece of fruit to be sucked dry of its juices by insiders, while employees and other creditors must try to slake their thirst at the dry well of bankruptcy. The fiduciary duty of corporate directors is not to be casually shrugged away with accompanying disregard for consequences. In this case, the consequence for plaintiff, Rivercity, marks the end of a costly, time-consuming and unsuccessful struggle for property rights. It is perhaps the ultimate irony that these rights could have perhaps belonged to Rivercity had the partners-directors simply dealt with the corporation in a fair and forthright manner.

Accordingly,

IT IS ORDERED that judgment be entered in favor of defendant and against plaintiff, each party to bear its own costs. The third party demand for indemnity is now moot and is likewise DISMISSED.