524 So.2d 1313 (1988)
WOODSTOCK ENTERPRISES, INC., Plaintiff-Appellant,
v.
INTERNATIONAL MOORINGS & MARINE, INC., Defendant-Appellee.
No. 87-143.
Court of Appeal of Louisiana, Third Circuit.
March 23, 1988.
*1314 Thomas B. Waterman, Ponchatoula, for plaintiff-appellant.
Juneau, Hill, Justice, Hill & Adley, Marc W. Judice, Lafayette, for defendant-appellee.
Before FORET, DOUCET and SWIFT[*], JJ.
FORET, Judge.
This is an action on open account filed by plaintiff, Woodstock Enterprises, Inc. (Woodstock) against International Moorings & Marine, Inc. (IM & M) for $26,625.00 for use of Woodstock hunting facilities. IM & M reconvened, alleging Woodstock was indebted to IM & M on a promissory note in the amount of $206,519.00. This appeal has been consolidated with Woodstock Enterprises, Inc. v. International Moorings & Marine, Inc., 524 So.2d 1319 (La.App. 3 Cir.1988), which is an action for breach of four hunting contracts between the same parties and in which a separate judgment is being rendered this date.
The trial court rendered judgment in favor of Woodstock on the suit on open account in the amount of $26,625.00 and, additionally, found that Woodstock was indebted to IM & M in the amount of $206, 519.00[1]. On the action for breach of the four hunting contracts, the trial court found that the contracts were void or voidable and had been effectively terminated by IM & M.
Woodstock appeals from the trial court's finding that the four hunting contracts were void or voidable. Additionally, Wood-stock contends that the trial court erred in finding that Woodstock was indebted to IM & M in the amount of $206,519.00. We conclude that the trial court was correct, and we affirm.

FACTS
In 1976, International Moorings & Marine, Inc. was formed by Charlie Mann, Harry Wilson, and Wilton Helveston. During 1978, these three formed a partnership entitled Southwest Louisiana Woodstock Plantation Investor Group. This partnership was formed for the purpose of investing in and developing Woodstock Plantation, a large tract of land in Mississippi, as a hunting and fishing facility. It was intended that Woodstock would be used to hunt and entertain IM & M clients and IM & M did begin using Woodstock to entertain clients after the formation of this partnership in 1978.
Woodstock was incorporated in early 1980 as Woodstock Enterprises, Inc. On May 13, 1980, shortly after Woodstock's incorporation, four hunting contracts were entered into between Woodstock Enterprises, Inc. and IM & M. These contracts granted IM & M the exclusive use of the hunting lodge on the Woodstock properties for a term of twenty years. In return, these contracts obligated IM & M to a minimum use of 507 man-days per year at a cost of $300 per man-day or $152,100.00 per year.
At this time, the Board of Directors of Woodstock resigned and was replaced by Helveston as the new Woodstock President; Hugh Cranford, an IM & M employee, as the new Woodstock Secretary-Treasurer; and Gerald Sanders, another IM & M employee, as Woodstock's new Treasurer. Several other shareholders/directors/officers and/or employees of IM & M assumed directorships in Woodstock.
*1315 Also, on this fateful day, May 13, 1980, all of the issued shares of Woodstock stock were sold to new owners; the majority of these purchasers being the same IM & M shareholders, officers, directors and/or employees, who were now new Woodstock officers and directors. IM & M received no stock in Woodstock Enterprises, Inc.
During 1978, 1979, and 1980, funds and services were advanced by IM & M to Woodstock for improvements to the hunting lodge, construction of deer blinds and a bridge, among other things. It was intended that IM & M would, at some time, acquire an interest in Woodstock or Woodstock properties. Although negotiations took place, no agreement whereby IM & M acquired an ownership interest in Woodstock was ever consummated. In June of 1980, Wilton Helveston, Woodstock's President, signed a promissory note on behalf of Woodstock in favor of IM & M in the amount of $206,519.00. This note represented IM & M's calculations as to its unsecured investment in Woodstock.
The relationship between IM & M and Woodstock apparently began to sour in November of 1982, when an ex-employee and competitor of IM & M, Wilton Helveston, entered the Big Lodge at Woodstock. Mr. Mann of IM & M wrote a letter on December 21, 1982 to Woodstock stating that IM & M would consider the exclusivity clause of the contract breached unless the Woodstock Board of Directors took action by January 15, 1983, to insure IM & M's exclusive use of the hunting lodge.
The situation continued to deteriorate. On July 6, 1983, Woodstock sued IM & M for $26,625.00 for use by IM & M of the Woodstock facilities between January 8 and January 23, 1983. This action commenced the instant litigation involving the promissory note in favor of IM & M and the four hunting contracts.

ISSUES
Woodstock Enterprises, Inc. contends that:
1. The trial court erred as a matter of law in applying La.R.S. 12:84 and the jurisprudence governing a director's breach of his fiduciary duty to his corporate principal to this case, a contractual dispute between two discrete and independent corporate entities.
2. The trial court erred in finding that Woodstock breached the exclusivity provision of the hunting agreements.
3. The trial court erred in finding that IM & M proved, by a preponderance of the evidence, an alleged indebtedness owed by Woodstock.
4. The trial court erred as a matter of law in failing to allocate the respective rights and obligations of the parties in accordance with the law of lease.
Appellant, Woodstock, contends that the trial court erred in applying La.R.S. 12:84 and the jurisprudence governing a director's breach of his fiduciary duty to his corporate principal to the controversy involving the four hunting contracts executed between Woodstock and IM & M. We find no merit in this assignment of error.
La.R.S. 12:84 states, in pertinent part:
"A. No contract or transaction between a corporation ... and any other business,... in which one or more of its directors or officers are directors or officers or have a financial interest, shall be void or voidable solely for this reason, or solely because the common or interested director or officer was present at or participated in the meeting of the board or committee thereof which authorized the contract or transaction, or solely because his or their votes were counted for such purpose, if:
(1) The material facts as to his interest and as to the contract or transaction were disclosed or known to the board of directors or the committee, and the board or committee in good faith authorized the contract or transaction by a vote sufficient for such purpose without counting the vote of the interested director or directors; or
(2) The material facts as to his interest and as to the contract or transaction were disclosed or known to the shareholders entitled to vote thereon, and the contract or transaction was *1316 approved in good faith by vote of the shareholders; or
(3) The contract or transaction was fair as to the corporation as of the time it was authorized, approved or ratified by the board of directors, committee, or shareholders."
It is clear, on its face, that this statute applies to transactions between a corporation and any other business where common or interested directors or officers are involved.
A contract between two corporations that have common or interested directors may be authorized, in good faith, by the Board of Directors of the contracting corporations. This authorization is valid only when the common or interested director or directors abstain from voting on the contract or transaction. As stated by the learned trial judge in his reasons for judgment, on the issue of authorization:
"The evidence, as I appreciate it, is to the effect that every one of the directors of IM & M were financially interested in the plaintiff [Woodstock] corporation, and there was no committee formed as provided by the Statute, so that Section [A(1)] could not have been complied with.... [I]t was not complied with because none of the votes of those Directors could be counted and there was no one else to vote."
The evidence is clear that all of the members of the Board of Directors of IM & M individually received stock in Woodstock Enterprises, Inc. and thus, were all financially interested in Woodstock. Therefore, this Court agrees with the trial court's finding that compliance with Subsection A(1), i.e., authorization by non-interested directors, was an impossibility.
Subsection A(2) states that a contract between two corporations wherein its directors or officers are common or interested, either as directors or officers or as having a financial interest, may be approved by a "good faith" vote of the shareholders.
It was stipulated at trial that the majority of IM & M shareholders were also shareholders of Woodstock, Inc. on May 13, 1980, when the hunting contracts were executed.
We agree with the reasoning of the United States District Court for the Eastern District of Louisiana in Rivercity v. American Can Co., 600 F.Supp. 908, 921 (E.D.La. 1984), wherein the district court interpreted La.R.S. 12:84 A(2), as follows:
"Certainly, a plain reading of the statute indicates that it is designed to apply to situations where stockholders are disinterested. For this reason alone, there is grave doubt as to whether this section of the statute is available as a cleansing agent."
This Court agrees that Subsection A(2) of the statute contemplates approval in "good faith" by disinterested shareholders. This interpretation, in conjunction with the fact that there was no evidence presented that shareholder approval was solicited as to the hunting contracts, supports a finding that Subsection A(2) was not and/or could not be complied with.
Finally, La.R.S. 12:84 A(3) requires that the contract or transaction "was fair to the corporation as of the time it was authorized, approved, or ratified by the board of directors, committee, or shareholders." In reviewing the evidence presented, this Court finds, as did the court in Rivercity, that the contract "is so rife with deficiencies and corporate irregularities as to make it unenforceable and void." Rivercity, supra, at page 918.
We affirm the trial court's finding that the four hunting contracts were not fair to IM & M as of the time they were ratified by the Board of Directors and/or shareholders and adopt the trial court's reasons for judgment, as follows:
"... I cannot find that these four hunting contracts were fair to the defendant corporation. As I view the evidence, the four of them essentially require the defendant to finance what seems to be the entire operation of the plaintiff corporation. For what? For nonexclusive hunting rights where the plaintiff corporation could have as many other people hunt on its property for *1317 whatever it wanted to charge them, for as many hunting stands at least as we've heard testimony to and there were quite a number of them, at a cost to the defendant corporation of at least ONE HUNDRED AND FIFTY TWO THOUSAND ONE HUNDRED DOLLARS ($152,100.00) a year. An awful high price to pay for that portion of entertainment which is included in what was contemplated by the contracts, essentially hunting and what goes along with it. The defendant corporation never received a share of stock. The hunting season lasts forty-five (45) days. It seems from what we've seen, essentially, the plaintiff facilities were used by the defendant on weekends. The only exclusive right that the defendant had for the price it paid was the exclusive right to use the hunting lodge. When you consider what they were paying for by these four contracts and that the plaintiff could make additional money from other sources, which indeed it apparently did because a lot of other people were out there it seems, I cannot construe from the facts that those contracts were fair to the defendant corporation."
In finding that the four hunting contracts were unfair to IM & M, we are, in no small measure, influenced by the undisputed fact that numerous officers, directors, and/or employees of IM & M became shareholders in Woodstock as a result of obligating IM & M on the four hunting contracts. It is highly significant that IM & M, the corporation itself, received no shares in Woodstock Enterprises, Inc., but instead, received only a twenty-year obligation and a $1,885,000 liability. Again, the language of Rivercity seems appropriate: "It is perhaps the ultimate irony that these rights could have perhaps belonged to [Woodstock] had the partners-directors simply dealt with the corporation in a fair and forthright manner."
Id., pg. 922. If only the common directors and officers of IM & M and Woodstock had issued the Woodstock shares in the name of IM & M, Inc. rather than in themselves personally, the taint of unfairness may have been more easily dispelled.
19 Am.Jur. Corporations § 1307 discusses transactions involving corporations having directors or officers in common, as follows:
"The most widely accepted view is that transactions between corporations having common directors or officers may be avoided if unfair, and, conversely, may not be avoided if fair. For example, where the circumstances show that the transaction would be of great advantage to one corporation at the expense of the other, especially where, in addition to this, the personal interests of the directors or any of them would be enhanced at the expense of the stockholders, the transaction is voidable by the stockholders within a reasonable time after discovery of the fraud."
The hunting contracts executed between IM & M and Woodstock were a great advantage to Woodstock and the common directors and officers and a great expense to IM & M.
The evidence reveals that the Woodstock shares owned by IM & M key personnel were obtained at either no cost or minimal cost and were sold for a substantial profit. IM & M discontinued payment on the contracts in January of 1983 and timely filed their affirmative defenses as to the voidability of the contract in response to Woodstock's action for breach of contract.
An interested director bears the burden of proving his good faith in entering into a contract on behalf of his corporation as well as the inherent fairness of such contract from the standpoint of the corporation. Rivercity v. American Can Co., supra, at 922; Noe v. Roussel, 310 So.2d 806, 818 (La.1975). Mr. Harry Wilson, as President of IM & M, signed the hunting contracts on behalf of the corporation. Wilson failed to testify at trial and no explanation for his absence was presented. Mann and Helveston, the other majority shareholders of IM & M at the time the contracts were executed, did testify at trial but presented no evidence as to why the Woodstock shares were issued to themselves *1318 personally as opposed to being issued to IM & M. Additionally, no credible evidence was presented to explain why the duration and payments of the hunting contracts were correlated to Woodstock liabilities rather than IM & M's needs. Therefore, we find that neither these individuals nor Woodstock carried the burden of proving the inherent fairness of these contracts from the standpoint of IM & M.
Woodstock contends that the trial court erred in finding that the exclusivity provisions of the hunting agreements had been breached. In light of the fact that this Court affirms the trial court's finding that the hunting contracts are inherently unfair to IM & M, it is unnecessary to decide this issue.
Woodstock next contends that the trial court erred in finding that IM & M had proven an underlying debt in the amount of $206,519.00 evidenced by an invalid promissory note. The trial court found that the evidence supported a finding that Woodstock was indebted to IM & M in this amount, and we cannot say that this finding is clearly wrong. We adopt the trial court's reasons for judgment as follows:
"... I find that the underlying obligation has been adequately demonstrated and proven although the note, itself, does not exist. The testimony is replete with evidence that IM & M, the defendant, did much work, performed many services, which inured, eventually, to the benefit of the plaintiff; sent men out there, work crews, sent heavy equipment, did repair work, did construction work. Now, it hasn't been proven how much that was worth, but it has been acknowledged, by the plaintiff, in that amount. There is evidence given by Mrs. Landry as to invoices and whatnot substantiating the amount of $206,519. It being a very unround figure, it obviously wasn't pulled from the air. The acknowledgement by the plaintiff in various financial statement has the effect of being an admission against interest, in my view, which is acceptable evidence, particularly, when it is accompanied by the other evidence that, in fact, much went into the plaintiff's property and project as a result of the resources of the defendant. Mr. Johnson, himself, testifies that there was a great deal of work and effort put forth over there by the defendant. He did not feel that it came to TWO HUNDRED THOUSAND DOLLARS. The manner in which he testified gave me the impression that he thought it wasn't too far from that. I think that's consistent with the other evidence. It's immaterial if the services were performed and the work done before the plaintiff was incorporated. It has inured to their present benefit. The plaintiff owns the property now, and it has the benefit of all of that work."
Helveston, Woodstock's prior President, testified that he was aware that IM & M had spent a considerable amount of money in improvements to the facilities at Woodstock. He additionally testified that he did not voice any objection to signing the note on behalf of Woodstock, as President. Helveston, also a director and executive officer of IM & M, testified that he acknowledged the fact that IM & M was owed money by Woodstock in a 10-K report prepared for the Securities Exchange Commission.
Mann, a shareholder in Woodstock and an officer of IM & M, testified that in 1980 and 1981, IM & M spent in the area of $300,000 or $400,000 for improvements to Woodstock. His testimony revealed considerable concern that an accounting of these funds was necessary.
Gerald Sanders, assistant comptroller at IM & M and treasurer of Woodstock from 1978 until 1981, testified that the figure evidenced by the promissory note represented a combination of improvements and certain other items that were made to the hunting lodge at Woodstock.
Although the testimony is unclear as to when specific monies of IM & M were invested in Woodstock, the evidence consistently supports a finding that considerable *1319 amounts were expended, in excess of the amounts paid under the hunting contracts, for improvements at Woodstock. Additionally, McGraw, Woodstock's accountant, testified that most of the income items set forth on Woodstock's financial statement were derived from IM & M. Viewing the evidence presented, this Court affirms the trial court's finding that Woodstock was indebted to IM & M in the amount of $206,519.00.
Finally, Woodstock contends that the trial court erred in finding that Woodstock was liable for expenses incurred in improving leased property and in failing to allocate the respective rights and obligations of the parties in accordance with the law of lease.
IM & M, in its reconventional demand, alleged that Woodstock was indebted to it in the amount of $206,519.00, evidenced by a promissory note executed June 15, 1980. In answer to this demand, Woodstock denied that it was indebted on the promissory note; denied the existence of the note; denied knowledge of the note; and alternatively alleged that if the note, in fact, existed, it was not authorized. Woodstock further defended, pleading that at the time of the alleged issuance of the note, the officers of Woodstock were employees of IM & M and acted on behalf of IM & M rather than Woodstock Enterprises, Inc. This was the sum of Woodstock's defenses.
The record clearly shows that the issue of leasehold improvements was never raised in the trial court, nor in any pleadings filed in that court. Pursuant to Rule 1-3 of the Uniform RulesCourt of Appeal, we will not review this issue. Issues not properly raised in the trial court will not be considered on appeal. General American Oil Co. of Texas v. Superior Oil Co., 416 So.2d 251 (La.App. 3 Cir.1982), writ denied, 421 So.2d 908 (La.1982); Wm. B. Coleman Co., Inc. v. Ackel, 459 So.2d 596 (La.App. 5 Cir.1984).
For the reasons assigned, the judgment of the trial court is affirmed. Plaintiff-appellant is to pay all costs of this appeal.
AFFIRMED.
NOTES
[*] Judge William Swift, Jr., Retired, participated in this decision by appointment of the Louisiana Supreme Court as Judge Pro Tempore.
[1] The trial court found the promissory note was invalid for lack of authorization by the Wood-stock Board of Directors but that nevertheless the underlying obligation therefor was proven, and granted judgment accordingly. The validity of the note is not before us on appeal.