**In re Bruce M.H. CLARK, Debtor.**

**Civ. A. No. 89–1126.**

United States District Court,
E.D. Louisiana.

June 6, 1989.

John M. Holahan, Pilie, M. Arnaud, Pilie & Pilie, New Orleans, La., for Clark.

Carl A. Dengel, New Orleans, La., Trustee.

Turner, Young & Hebbler, Emile L. Turner Jr., New Orleans, La., for First Bank.

Herman, Herman, Katz & Cotlar, Sidney A. Cotlar, New Orleans, La., for Pontchartrain Bank.

J. William Becknell, II, David R. McDaniel, Becknell, Dwyer, Bencomo & McDaniel, New Orleans, La., for New Orleans La Saints.

Newman, Drolla, Mathis, et al, Robert A. Mathis, Metairie, La., for Pontchartrain State Bank.

Baker & Hostetler, Sargent Karch, Brian S. Harvey, Washington, D.C., for National Football League Management Council.

## ORDER AND REASONS

FELDMAN, District Judge.

This bankruptcy appeal presents a question of special importance to the National Football League and its players.

Bruce Clark is a football player for the New Orleans Saints. On October 20, 1988 he filed a petition for relief under Chapter 11 of the Bankruptcy Code, and on December 1, 1988 he converted the proceeding to one under Chapter 7.[1]

The issue on appeal before this Court is whether the Bankruptcy Court erred in holding that Clark's post-petition salary from his 1988–89 player contract with the Saints was a part of the bankruptcy estate in spite of 11 U.S.C. § 541(a)(6). The Bankruptcy Court held those earnings were a part of the estate, and, therefore, within the reach of creditor claims.

At the time of the filing in bankruptcy, Clark owed large sums to the First City Bank and the Pontchartrain State Bank.[2] As of December 14, 1988, the Saints owed Clark $370,625 under his 1988–89 season contract.[3]

This appeal has national implications because Clark's contract with the Saints was a standard form contract used by all twenty-eight NFL teams and the League's players.[4] Clark's contract also had four amendments concerning incentive bonuses, salary advances, loan forgiveness, and a one-year "skill guarantee". The "skill guarantee" amendment to the contract is at the heart of this appeal. The Bankruptcy Court ruled against Clark; this Court reverses.

What fuels this dispute is a clash between Section 541(a)(6) of the Bankruptcy Code and the skill guarantee addendum to

---

1. The debtor contends that conversion of a Chapter 11 proceeding to a Chapter 7 proceeding dates back to the October 20, 1988 filing of the Chapter 11 proceeding under Bankruptcy Rule 1019. No one makes specific objection to this contention.

2. The debtor had made various assignments of his Saints salary to both banks. The Saints inform the Court that, for purposes of this appeal, they do not assert a creditor's interest, and that their understanding of the 1988–89 contract is consistent with Clark's and the NFL Management Council's interpretation of his contract.

Clark has also filed an appeal to this Court concerning the Bankruptcy Court's ruling that the automatic stay entered in this case be lifted and modified.

3. Clark's salary under his 1988–89 contract was $575,000; for 1989–90, $625,000; for 1990–91, $650,000. For the 1988–89 season, he was paid $35,937.50 for each of the Saints' sixteen games

(as well as $4,878 for attending training/mini camp and workouts). As of October 20, 1988, the filing date, he had played seven games, and nine games remained in the season.

4. The standard form contract has some twenty-four clauses. Under the contract, a player has a host of predictable obligations:

(1) "Club employs Player as a skilled football player. Player accepts such employment." (Clause No. 2)

(2) "[Player] agrees to give his best efforts and loyalty to the Club...." (Clause No. 2)

(3) "[P]layer will cooperate with news media, and will participate upon request in reasonable promotional activities of Club and the League." (Clause No. 4)

(4) "If player fails to establish or maintain his excellent physical condition to the satisfaction of the Club physician, or make the required full and complete disclosure and good faith response to the Club physician, then Club may terminate this contract." (Clause No. 8)

the contract. The addendum provides in part:

> GUARANTEE. Despite any contrary language in this NFL Player Contract, Club agrees that for the year 1988 only it will pay Player the full salary provided in Paragraph 5, including any deferred salary applicable to this contract despite the fact that, in Club's judgment, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, and Players' contract is terminated via the NFL waiver system.
>
> PHYSICAL CONDITION. This guarantee by Club will not become effective unless and until Player passes Club's physical examination for the year *1988.*

The Bankruptcy Court held that, in spite of Section 541(a)(6),[5] Clark had earned his entire 1988–89 contract salary simply upon passing his physical examination and before the filing of his Chapter 11 petition on October 20, 1988. Thus, the court held that his earnings, his 1988–1989 season contract entitlements, were a part of the bankruptcy estate and subject to creditor claims (principally First City and Pontchartrain). The court stated:

> In essence, the skill guarantee renders inoperative the provision of the NFL Player Contract wherein the Debtor is employed as a "skilled football player" and is required to maintain a satisfactory level of skill or performance or risk termination of the contract and its attendant monetary benefits. With the addition of the skill guarantee, the Debtor's skill or performance becomes an irrelevant factor relative to his receipt of the full contractual salary.... [T]he Debtor had essentially fulfilled all obligations necessary to his entitlement to the funds, specifically passing the physical examination. The post-petition payments of the earnings, rooted in the pre-bankruptcy past, constitute property of the estate. The Debtor's entitlement to the funds is not dependent upon any further services as a "skilled football player," but rather was dependent only upon his passing the physical examination.

Clark, armed with the support of the Saints and the League Management Council, now appeals the Bankruptcy Court's ruling to this Court. At issue, quite simply, is the thrust of the skill guarantee addendum: Does it mean that Clark earned his entire salary merely upon passing the physical; that he did not have to play football; that he was absolved from complying with other contract obligations?

The Bankruptcy Court's ruling was clearly erroneous and must be reversed.[6]

It is helpful to begin by stating the obvious: Clark was hired to play football, not just to pass a physical examination.

Reading the skill guarantee addendum in light of the contract as a whole,[7] it is clear

---

**5.** 11 U.S.C. § 541(a)(6) exempts post-petition personal service earnings. It provides:

> (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> (6) Proceeds, product, offspring, rents, or profits of or from property of the estate, except such as are earnings from services performed by an individual debtor after the commencement of the case.

Thus, if Clark remained obliged to perform services (play football) after he filed for bankruptcy, notwithstanding the skill guarantee addendum, his post-petition earnings may not be included in the bankruptcy estate. *See Matter of Hellums,* 772 F.2d 379, 381 (7th Cir.1985); *In re Fitzsimmons,* 725 F.2d 1208, 1210–11 (9th Cir. 1984); *In re Leibowitt,* 93 F.2d 333, 385 (3d Cir.1937); *In re Sloan,* 32 B.R. 607, 611 (Bkrtcy.

E.D.N.Y.1983); Collier on Bankruptcy, § 70.22(3) (14th ed. 1978).

**6.** Bankruptcy Rule 8013 provides:

> On an appeal the district court or bankruptcy appellate panel may affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings. Findings of Fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous....

**7.** Under Louisiana law, a contract must be construed in light of the other provisions so that each is given the meaning suggested by the contract as a whole. La.Civ.Code Ann. art. 2050. On appeal, the parties have focused their arguments on the Bankruptcy Court's construction of Clark's 1988–89 contract with the Saints, particularly the skilled guarantee addendum.

that the addendum only reflects additional job security which Clark obtained in his contract talks with the Saints. The addendum does not, by its text or within the structure of the contract, make meaningless the obligations he owed to the Saints as they were mandated in other provisions of his contract. The Saints did not expressly agree to such a broad nullification of Clark's obligations to the team, nor can the Court reasonably infer such an intention from the contract itself. While the Bankruptcy Court was correct in inferring that Clark's skill or performance were irrelevant to one aspect of his salary, skill or performance were not, under the contract, the sole events which conditioned Clark's receipt of his full salary. He could not refuse to play ball; he could not refuse publicity appearances; he could not refuse to abide by team and League rules; he simply avoided the hazards of being cut at training camp. Clark's skill or performance were indeed irrelevant to making the team; they were not, however, irrelevant to receipt of his full salary because he continued to be obliged to perform what the contract ordered him to perform as a player in the League.

As it relates to this controversy, the addendum does nothing more than narrow the Saints right to terminate Clark's contract in the event of his deficient "skill, performance and conduct" at training camp. Clause 11 of the original Contract, which was changed by the addendum, provides:

11. SKILL, PERFORMANCE AND CONDUCT. Player understands that he is competing with other players for a position on Club's roster within the applicable player limits. If at any time, in the sole judgment of Club, Player's skill or performance has been unsatisfactory as compared with that of other players competing for positions on Club's roster, or if Player has engaged in personal conduct reasonably judged by Club to adversely affect or reflect on Club, then Club may terminate this contract.[8]

To agree with the Bankruptcy Court's construction of the contract would, indeed, lead to curious consequences. *Continental Oil Co. v. Crutcher,* 434 F.Supp. 464, 471 (E.D.La.1977) (under Louisiana law, "A court should not construe the terms of a contract in such a manner as to lead to absurd or unreasonable consequences.") Following the Bankruptcy Court's construction of the contract would mean that as soon as a player passed his physical examination he would no longer have to "maintain his excellent physical condition", or devote "his best efforts and loyalty to the Club"; he might not even have to play football, whether pre-season, regular season, or post-season; he might not have to attend Club meetings.

Thus, the ruling of the Bankruptcy Court distorts the contract and the apparent intent of the parties. *Rivercity v. American Can Co.,* 600 F.Supp. 908 (E.D.La.1984), *affirmed,* 753 F.2d 1300.[9] Clark and the Saints assert that the effect of the addendum was not to nullify all of the clauses of the main contract, but that it merely changed the reach of Clause 11.[10] This Court agrees. In sum, the salary payments received post-petition may not be

---

**8.** The addendum further states that its terms shall take effect "despite any contrary language in this NFL Player Contract".

**9.** Commenting on Louisiana law, the court stated:

It is well established that contracts have the effect of law upon the parties and the courts are bound to give legal effect to such agreement according to the true intent of all the parties. 600 F.Supp. at 916.

**10.** The banks affected invoke 11 U.S.C. § 552 and suggest that the earnings received by the debtor after October 20, 1988 accrued prior to that date. Section 552(b) states in part:

... if the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, product, offspring, rents, or profits of such property, then such security interest extends to such proceeds, product, offspring, rents, or profits acquired by the estate after the commencement of the case ...

But Section 552 only applies to post-petition rents, offspring, and the like, which spring from a bundle of fixed rights. Clark's rights in the entire contract were not fixed.

considered as part of the bankruptcy estate under Section 541(a)(6).[11]

Accordingly, for the foregoing reasons, the ruling of the Bankruptcy Court is REVERSED as being clearly erroneous.

The debtor's appeal regarding the Bankruptcy Court's ruling that the automatic stay be lifted is MOOT.

---

**11.** *See Matter of Hellums,* 772 F.2d 379, 381 (7th Cir.1985) ("Post-petition wages are not property of the estate of a Chapter 7 bankrupt", under 11 U.S.C. § 541(a)(6)); *In Re Sloan,* 32 B.R. 607, 611 (Bkrtcy.E.D.N.Y.1983) ("Where a debtor derives post-petition commissions under a pre-petition contract, and such commissions are dependent upon the continued services of the debtor, they do not constitute property of the estate", under Section 541(a)(6)). Clark was paid on a per-game basis.